Filed 7/8/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S034800 |
| v. | ) | |
| | ) | |
| RICHARD LUCIO DeHOYOS, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. C-77640 |
| _____ | ) | |

A jury found defendant Richard Lucio DeHoyos guilty of the 1989 first degree murder of nine-year-old Nadia Puente.  (Pen. Code, § 187, subd. (a).)[1]  The jury determined defendant had kidnapped her in order to commit child molestation and that he raped, sodomized, and committed a lewd and lascivious act upon her.[2] (§§ 207, subd. (b), 261, subd. (a)(2), former 286, subd. (c) as amended by Stats. 1988, ch. 1243, § 6, p. 4133 (now 286, subd. (c)(1)), 288, subd. (a).)  The jury found true the special circumstances that the murder was committed while engaged in the commission of kidnapping, forcible rape, sodomy and performing a lewd and lascivious act upon a child under the age of 14.  (Former § 190.2, subd. , (a)(17)(ii)-(v), added by initiative, Prop. 7, approved by voters Nov. 7, 1978 (see

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Defendant was 31 years old at the time of the crimes.

now § 190.2, subd. (a)(17)(B)-(E).)  The jury found defendant was sane when he committed the crimes and determined the appropriate penalty to be death.  Prior to sentencing, however, the trial court granted defendant's motion for a new trial based on juror misconduct.

On retrial, the second jury found defendant guilty of the same charges:  first degree murder, kidnapping for child molestation, forcible rape, sodomy, and committing a lewd and lascivious act upon a child under 14.  (§§ 187, subd. (a), 207, subd. (b), 261, subd. (a)(2), former 286, subd. (c), 288, subd. (a).)  The jury found true the same special circumstances.  (Former § 190.2, subd. (a)(17)(ii)-(v).)  The jury again found defendant to be sane at the time he committed the crimes and determined death to be the appropriate penalty.  The trial court denied defendant's motion for new trial and for modification of the verdict.  The trial court imposed a sentence of death, with additional determinate terms of imprisonment totaling 19 years for the nonhomicide offenses.  This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment.

## I. FACTS

### A. Introduction

As nine-year-old Nadia Puente walked home from her elementary school, defendant approached her in his car, told her he was a teacher, and asked her for help moving some books.  After using this ruse to get Nadia into his car, defendant drove to a motel where he had earlier rented a room for two.  There defendant raped, sodomized, and killed Nadia.  He put her body in a trash can, which he stuffed into the trunk of his car.  He drove to Griffith Park in Los Angeles, waited until after dark, and then left the trash can containing Nadia's body in the park.  Defendant fled to San Antonio, Texas, where he was apprehended about a week later.  When interviewed by investigating officers, defendant eventually admitted

2

killing Nadia, but claimed it was unintentional, that he did not rape her, and that he sodomized her only after she was dead.

At trial, defendant additionally claimed he did not have the required mental state to commit the crimes due to mental illness. He also claimed he was insane at the time he committed the crimes. The jury rejected defendant's claims and returned a verdict of death.

## B. Guilt Phase

### 1. *The prosecution's evidence*

On March 20, 1989, defendant rented a room at the Ha'Penny Inn in Santa Ana, California. The Inn registration card and receipts indicated he registered for two people to stay in the room.

Sandra C., a student in the third grade at Diamond Elementary School in Santa Ana, was walking alone home from school on the afternoon of March 20, 1989, when a gray car pulled up. The driver, a thin Caucasian or Hispanic man, said "Excuse me" and called her over to the car. The man told Sandra that he was a teacher and asked her if she would carry some books over to the Carr Intermediate School. Sandra saw some books in the car, but she did not trust the man. She told him "no," that she could not go with him. She said that her mother was waiting for her and she had to go. The man said okay and drove away. Sandra later told her mother, the assistant principal of her school, and the police, about the incident.

Another student from Diamond Elementary School, Jose O., told police he saw Nadia get into a gray car on the afternoon of March 20, 1989, after she briefly talked to the man inside the car.

According to the assistant manager of the Ha'Penny Inn, defendant checked out of his room early. Defendant was given the refund of his $10 key deposit when he returned his key on March 20, 1989.

The next day, March 21, 1989, Nadia's body was found in a plastic trash can liner in an aluminum trash can located in Griffith Park in Los Angeles. She was clothed, but missing her panties, and wrapped in a bedspread from the Ha'Penny Inn. The trash can and the plastic liner were also from the Ha'Penny Inn.

An autopsy of Nadia's body showed that she died from asphyxia due to chest compression. In addition to bruising on Nadia's chest and other parts of her body, the medical examiner found an area of abrasion, bruising, and a laceration near the entry of her vagina. There was also bruising of the lining of the vagina. There was bruising around the anus and a small abrasion. There were also injuries in the area of the rectum. The injuries to Nadia's vagina and in the area of her anus and rectum were consistent with the forcible insertion of an erect human penis. The medical examiner determined that the injuries to her vagina and anus were inflicted before her death, but could not determine whether the injuries to her rectal area were sustained before death.

The medical examiner did not find any clear indications of ingestion of fluid and could not tell if drowning was a factor in Nadia's death. But when he first examined Nadia, her hair and clothing were wet and the tips of her fingers were wrinkled. Wrinkling is caused only by immersion in water. The medical examiner testified that Nadia's injuries were consistent with her being bent over the edge of a bathtub during the infliction of the injuries to the vaginal and rectal areas. The medical examiner could not tell whether Nadia was conscious during the infliction of the injuries.

4

One of the fingerprints on the plastic trash can liner that held Nadia's body was identified as belonging to defendant.

Santa Ana police found defendant's silver Nissan Sentra in the long-term parking lot of the Los Angeles International Airport. They learned that defendant was in San Antonio, Texas, and that he was trying to find work there at a Taco Bell restaurant. On April 1, 1989, San Antonio police officers arrested defendant on a warrant obtained by the Santa Ana police. San Antonio police officers took defendant to a nearby police office, where he was advised of and waived his constitutional rights. In a tape-recorded interview, defendant was questioned by two Santa Ana detectives.

Defendant initially denied knowing anything about Nadia's death and said he thought he had been arrested because of something to do with a car. He admitted checking into the Ha'Penny Inn during the day of March 20, 1989 and said he checked out in the early morning hours of March 21, 1989. Attempting to account for his activities on March 20, defendant told the interviewing detectives that he had quit his job at a Santa Ana Taco Bell restaurant earlier that day after his manager had called him in and criticized his work. He later returned to the Taco Bell to apologize to the manager. He subsequently checked into the Inn because he was relocating after getting into an argument with some of his roommates. Defendant claimed that after he checked into the Inn, he went to the area near the Diamond Elementary School because he was hoping to collect a tax refund check from the post office nearby. He then returned to the Taco Bell to socialize and sometime later he went out partying at a club with a friend who had also worked at the Taco Bell. Defendant denied picking up a little girl or anyone else and taking her to his room. He agreed to give the detective samples of his hair, blood, and saliva.

5

Detectives described to defendant the probable kidnapping of Nadia and the finding of her body wrapped in a "blanket" and in a trash can taken from the laundry room of the Ha'Penny Inn. They told defendant his fingerprints had been found on the trash can liner. Defendant again denied killing anyone, but moments later, said the killing of Nadia was an accident.

Assuring the detectives he was telling the "absolute truth," defendant said he picked up Nadia around 2:30 p.m. He told her that he was a teacher, that he was being transferred, and that he needed help with some school books. Nadia agreed to help him and got into his car. He drove to the Inn where he had already checked in. Nadia carried a couple of his boxes into the room. Defendant told her to "sort [his] stuff out" and to put it into the dresser drawers; then he would take her home. When Nadia asked to use the phone, defendant told her it was not working. Although defendant did not do anything to her, Nadia started screaming as if she was afraid. Defendant said he had been getting ready to take a bath and when Nadia started screaming, he "got carried away when she freaked me out." He got her in the bathtub and held her under the water until she was dead.

Defendant subsequently provided a variation of this story. He again said he had not intended to harm Nadia, but he was upset and disgusted about the confrontation he had had with his manager earlier that day and the fact that he had lost his job. He picked up Nadia, just wanting to talk to somebody. When defendant had Nadia in the room, he was angry and he wanted "to do something," but Nadia was too young for him. He took his clothes off and began taking a bath. Nadia became scared and asked to go home. Defendant told her to bring him a towel and that he would take her home. However, when Nadia approached him, defendant grabbed her hand and pulled her to the bathtub. When she started screaming, defendant pushed her over the tub and held her facedown in the water.

He did not want anyone coming from next door to investigate because it would "start a big scene" and he would not be able to "explain all this."

Defendant initially denied sexually molesting Nadia, but then claimed that he did so only after she was dead and he had placed her on the bed, removing her panties. He said he molested her anally and inserted his finger into her vagina.

After the sex acts, defendant wrapped Nadia in the bedspread, which also served as the blanket for the motel bed. He was scared and did not want anyone to see him carry Nadia out of the room, so he brought a motel trash can to his room and put Nadia's body into it. He put the trash can into the trunk of his car and drove on the freeway while he thought about where to put her body. He proceeded to Griffith Park Observatory, where he waited until it was dark. He then left the trash can about a quarter-mile up the road from the Greek Theater and drove back to Santa Ana. He checked out of the Inn and went back home. He read the newspapers about Nadia's murder and knew his car matched the description of the car and that he resembled the composite drawing of the man who approached Sandra C. After he picked up his last paycheck from Taco Bell, defendant flew to San Antonio because he was worried that he would be apprehended.

Defendant claimed he had never done anything like this before.

### 2. *The defense evidence*

Defendant presented testimony from a number of lay witnesses regarding his behavior prior to committing the crimes against Nadia. Defendant also presented the testimony of eight expert witnesses who testified about defendant's mental disorders and brain damage.

### a. *Family Members*

Defendant's parents testified that defendant had been different from their other children since he was a toddler. Defendant would withdraw from his

7

mother's hugs and would throw tantrums, even in his crib.  As he grew up, he was stubborn and would get angry.  He would not listen to or obey directions and refused to do household chores.  He got into a lot more trouble than the other children and his mother disciplined him to "straighten him out."  She hit him with anything nearby, including a belt, a hanger, and a broomstick.  One of defendant's brothers testified defendant had learning problems in school.

When defendant was about 12 or 13 years old, his parents began taking him to Mexico to visit a faith healer, a *curandero*.  The *curandero* acted as a guide or an advisor to the family.  He told defendant to pay attention and behave.  On one of these visits, the other children stepped out of the room, leaving defendant and his parents with the *curandero*.  About five minutes later, defendant ran outside.  His face was red and his eyes were bulging.  He told one of his brothers that they "made [him] see the good side and the bad side of hell."

Defendant's behavioral problems continued.  Defendant's mother recalled one time when defendant became so enraged with her after she asked him a question about why he did not wear certain clothes that he pushed her against a closet and threw books at her.  When defendant was 17 years old, he jabbed at his mother's stomach with a broomstick.  At the time his mother was several months pregnant.  His eyes were bulging and "lit up," his face was red, and he was cursing.  As a result of that incident, defendant's father told defendant he needed to leave the house.

### b. Ex-wives

Defendant lived with at least 10 different women and was married a number of times.  Two of his former wives testified at his trial.

Gloria Lara met defendant in high school when she was 14 or 15 years old.  Defendant was a few years older than her.  They were married in 1975 when she

was 16 years old and in 10th grade. Four days after they were married, defendant heard Lara talking on the phone to a girlfriend. He mistakenly thought Lara was talking about a former boyfriend of hers. He subsequently initiated sex with Lara. As Lara was lying on the floor, defendant tried to cover her face with a towel and stabbed her in the area of her stomach. Defendant seemed scared and surprised by what he did. Lara required surgery and was in the hospital for about two weeks. Defendant was arrested, but later released when Lara "dropped charges" against him. She lived with defendant for two more years. They had a daughter together. The only other time he was violent was when she left him; he was upset and pulled her hair.

On cross-examination, Lara testified defendant called her sometime before Easter week of 1989. Defendant told her he was in California, but said there was nothing left for him there and he was coming to live in Texas. Lara picked defendant up from the San Antonio airport a few days before Easter. During the time between picking defendant up and defendant's arrest about a week later, Lara had several conversations with defendant. She told a prosecution investigator that during one of those conversations, defendant said he was enjoying himself at a San Antonio club, that the clubs in California were terrible and that "[o]ver there [California], you could kill somebody and get away with it." After defendant's arrest, Lara received a call from defendant from the jail. He told her he had been arrested for killing a nine-year-old girl. He said that he did not mean to kill her. When Lara asked defendant why he killed the girl, defendant said "she was getting out of hand."

After dating a short time, defendant married Maria Esparza in September 1984. Esparza and defendant only lived together for the next five months, during which time they had problems due to defendant's jealousy and anger. Defendant often threatened to leave Esparza. In January 1985, defendant came home and

9

was picking up some clothes. Esparza asked defendant where he was going. Defendant responded by cursing at Esparza. He hit and pushed her into the bathroom and to the edge of the bathtub. As she was hanging over the bathtub, defendant placed his knee on her chest and his hands around her throat. He choked her. As she was losing consciousness, she heard him say he was going to kill her. He said: "Die, die." She managed to grab a small teaspoon or fork and jabbed him in the face. Defendant got up, called her a bitch, and ran away. Although the police were contacted, they could not find defendant and Esparza never saw him again. She subsequently filed for divorce.

Esparza recalled that something unusual happened during their wedding reception. Esparza's brother told defendant to try and make Esparza happy. Defendant did not like the comment and told Esparza's brother not to butt in. Defendant and her brother then got into a fight.

Esparza testified she never saw defendant use cocaine, but she noticed that he bled from his nose onto the pillow at night. She saw defendant drink alcohol, but testified he did not drink excessively and did not arrive home drunk.

### c. *Military Friend, Coworkers*

Jerry Taylor testified he met defendant in 1979 when they were assigned to the same army unit at Fort Colby in Panama. According to Taylor, defendant responded disrespectfully to criticism by superior officers, had a reputation for not accepting correction, and went AWOL for at least 30 days during the time he was posted there.

Sam Morrison worked with defendant in 1982 for about a year in a telemarketing firm. Morrison described defendant's odd behavior as including jumping on the top of his desk, running around his desk, and yelling into the phone. Defendant was the class clown in the office, and bragged that he "had

10

women all over the country, all over the world." Defendant would visit Morrison's house and drink pitchers of margaritas with Morrison's father.

Paul Shawhan was defendant's supervisor in 1989 at USA Aluminum. According to Shawhan, defendant acted "like a self-appointed police officer," continually reporting other people's minor infractions. Shawhan said defendant had a bad temper and when something was not going exactly the way he wanted, he would get angry quickly. Shawhan eventually terminated defendant's employment because he got into a physical confrontation with another employee. Asked to describe the incident, Shawhan testified the other employee was simply paying for his food at a lunch truck when defendant became upset, "jump[ed] up in his face and start[ed] making all kinds of motions like he [defendant] was going to do something." Defendant seemed both angry and anxious. After Shawhan fired defendant, defendant responded that "it was okay" because the Los Angeles Police and Sheriff Departments were interested in employing people like him who possessed an "international passport."

Norma Sandoval was an assistant manager at a Taco Bell restaurant where defendant was also an assistant manager. She worked with him for several months in early 1989. Sandoval testified defendant got along reasonably well with others. When he worked, he would joke around and talk about having sex with multiple girls at the same time. Defendant asked her to go out. Sandoval said he made her feel nervous.

Mary Ann Scott was the manager of the Taco Bell restaurant where defendant worked as assistant manager for two months. Scott testified that defendant seemed slow to learn the paperwork portion of his job and that he tried to find an easy way out in other areas of his work. Although Scott spent extra time working with defendant, he never seemed to get his work completed and she had

11

to finish it for him.  She talked to him about the problem many times.  She said defendant got upset more readily than other employees when he was corrected.

Scott's supervisor, Dennis Burkhart, testified that once when he was visiting the Taco Bell where defendant worked, defendant asked Burkhart to evaluate defendant's performance.  When Burkhart relayed to defendant some of Scott's criticisms of him, defendant claimed Scott was picking on him.  Defendant seemed angry, like he was boiling inside, and appeared frustrated.  Defendant was perspiring, his eyes bulged out, his face was red and he glared at Burkhart.  Burkhart was afraid that defendant was going to physically assault him.

On March 20, 1989, Scott called defendant at home around 6:30 or 7:00 a.m.  She was upset and told him to come immediately to the Taco Bell because he had not cleaned the store properly when he closed the previous night.  Defendant arrived about 10 minutes later and was angry.  They got into a heated argument with raised voices.  Defendant said Scott was always complaining and that if he could not do the job the way Scott wanted, then "I guess I am out of here."  Scott told him that was stupid, but defendant threw his keys into the office on the desk and stomped out the door.  Scott denied telling defendant that he was fired.  A few days later, defendant came to the Taco Bell for his paycheck and said he was leaving California.  Scott subsequently received a phone call from someone at a Taco Bell in San Antonio, Texas, asking about defendant because defendant was there and applying for a job.  Scott relayed the information to the police, who had previously interviewed her.

### d.  *Expert Witnesses*

Dr. Monte Buchsbaum, a professor of psychiatry and a director and supervisor of positron emission tomography (PET) at Mt. Sinai School of Medicine, and Dr. Stephen Lottenberg, a nuclear medicine physician working with

12

Buchsbaum, both testified about a PET scan administered to defendant in June 1991. The scan of defendant's brain showed abnormality or damage on the right side in the areas associated with emotional behavior, planning and organization. Buchsbaum testified he would expect defendant to have problems controlling impulsivity and rage. He believed the damage had existed for at least a decade, and specifically on the date defendant raped and killed Nadia. Lottenberg testified he could not determine whether the test results would have been the same had the scan been administered on the day of the crimes.

Dr. Arthur Kowell, a specialist in clinical neurology, conducted a brain electrical activity mapping (BEAM) scan on defendant in 1992. A BEAM scan measures the electrical response of the brain after a visual and auditory stimulus is given. Out of the four subparts of the scan, defendant tested normal on three parts and abnormal on one part — the visual test. The areas that showed abnormal results were from the portions of the brain that involve sensory motor strips, the integration of sensory processes and spatial relationships, and an area that concerns language, speech, memory, and emotion. With respect to the portion of defendant's scan that showed abnormality in both temporal lobes, Kowell stated that individuals with such problems may experience rage attacks. However, Kowell explained, he could not correlate defendant's scan to an inability to control his temper or a tendency to be violent because the results of a single scan are not predictive of behavior. Although Dr. Kowell could not say what a BEAM scan of defendant would have shown on March 20, 1989, his experience with the records of patients over a period of time indicated there is general consistency regarding test results, assuming there is no intervening pathologic process.

Dr. Paul Berg, a licensed psychologist and a marriage, family, and child counselor, evaluated defendant in November 1990 and in December 1992. He was asked to conduct a general psychological profile of defendant and to determine

13

whether defendant was a sexual pedophile. Berg interviewed defendant and three members of defendant's family, administered a number of psychological tests to defendant, and reviewed multiple reports from other doctors and investigators.

Dr. Berg testified that defendant was "hypersexualized," but he did not fit the clinical definition of a pedophile. Although defendant reported he had sexually molested a younger sister, defendant was too young at the time for his conduct to support a diagnosis of pedophilia. Berg formed the opinion that defendant was suffering from a mental illness on March 20, 1989. Berg determined that the diagnostic possibilities for defendant were, in descending order: "schizophrenic disorder, major depression, alcohol abuse, and dependency." Berg found that defendant also had personality disorders, including paranoid personality and schizotypal personality. Berg stated that individuals with such severe disorders cannot handle stress.

Dr. Berg believed that a number of stressors occurred on March 20, 1989, which defendant could not handle, including the confrontation with his manager, his perception that he was fired, his feeling that he had to do something about it, his resulting rage and desire to kill Scott, his inability to earn money, and his attempt to obtain drugs to remediate how he was feeling. Berg opined that defendant sought Nadia's company because he was desperate, depressed, and seeking any source of reassurance. Berg surmised that when Nadia came into the bathroom and saw defendant naked, it reminded defendant of feeling humiliated and shamed by his mother. He was unable to control his rage and the killing resulted. Berg testified he did not think defendant knew he was killing a child when he pressed Nadia against the bathtub; he thought he was killing Scott. Berg considered defendant's sexual activity with Nadia after her death, which defendant had told Berg was his method of finding out whether Nadia was alive or feigning dead, to be extraordinarily bizarre and "the idea only of a mentally ill person."

14

Defendant called Dr. Seawright Anderson, a board-certified psychiatrist who had been appointed by the court to render a professional opinion as to whether defendant was sane on the date he killed Nadia, to testify on behalf of the defense. Anderson conducted a mental status examination of defendant in August 1991. He diagnosed defendant with schizoaffective disorder, a history of polysubstance abuse, and a history of multiple head injuries. Based on subsequent reports, he also felt defendant had an organic personality disorder. According to Anderson, defendant's schizoaffective disorder made him frustrated, suicidal, and depressed. It impaired his judgment, insight, and ability to control his inner impulses and frustrations.

Dr. Anderson believed that on the day defendant raped and murdered Nadia, he was under stress related to his contact with Scott and the failure of his income tax refund check to arrive. He also was under the influence of controlled substances. Noting defendant's inconsistent accounts of the events surrounding his crimes, Anderson felt defendant was not lying, but was experiencing misconceptions over which he had no conscious control. Anderson believed defendant did perceive Nadia as a little girl, but at the time of the crimes he "actually did not perceive her fully as a little girl." His visual perception was distorted by his extreme anger, such that he believed he was killing Scott, not Nadia.

Dr. Jose J. LaCalle, a clinical psychologist, was appointed by the court as an expert for the defense. In order to evaluate defendant's mental health, LaCalle conducted multiple clinical interviews with defendant, reviewed defendant's medical, psychiatric, and criminal histories, interviewed family members, spouses and others, administered multiple psychological tests, and consulted with other defense experts. According to LaCalle, defendant's psychological testing produced mainly inconsistent or invalid results, but based on the remaining tests,

15

his interviews with defendant, and defendant's medical and social histories, LaCalle concluded that defendant suffered from the following mental illnesses on March 20, 1989: organic personality syndrome, explosive type; borderline personality disorder, severe; and organic impairment, a medical condition. LaCalle believed that both of defendant's psychological disorders were in operation when defendant killed Nadia because both conditions were chronic and were developed in defendant's early life. According to LaCalle, defendant experienced uncontrollable rage and his thinking processes were impaired because of his illness. LaCalle opined that when defendant lost his job at Taco Bell, something inside him "broke," provoking an extraordinary reaction and emotional outburst.

Dr. Susan Fossum, another licensed clinical psychologist appointed by the court as an expert for the defense, examined defendant in late 1992. She diagnosed defendant with organic personality syndrome, explosive type, with overlapping chronic schizophrenia of the paranoid type, and narcissistic personality disorder with features of borderline personality disorder and sociopathic personality disorder. She also concluded that defendant's right frontal lobe, right and left temporal lobes, and right parietal lobe were marked by extensive dysfunction. She believed defendant had these diagnoses at the time he raped and murdered Nadia and that as a result of his disorders, defendant was unable to control his emotions, had poor self-monitoring, poor impulse control, poor judgment, and poor ability to distinguish or perceive reality. Fossum testified that defendant's difficulty with abstract thinking, his socially inappropriate behavior, naivety, and lack of self-critical ability were indicators of his brain damage. She believed that early in the morning of March 20, 1989, defendant's narcissistic personality structure began to undergo a disintegrative process caused by Scott's castigation of him. In a confused, fearful, and raging state, defendant

16

lost control of himself and reached out to Nadia for reassurance and company. Fossum believed defendant was confused about what he was physically doing when he raped, sodomized, and killed Nadia.

Dr. Arnold Purisch, a clinical psychologist specializing in clinical neuropsychology, performed a comprehensive neuropsychological evaluation of defendant in 1992 at the request of the defense. Purisch interviewed defendant for nine hours over two days, administered a battery of 21 neuropsychological tests, reviewed numerous records and reports detailing defendant's family, academic, military and work histories, and considered the reports prepared by other defense experts in the case. Purisch testified that he was impressed that, despite differences, when taken as a whole, there was a marked convergence among the experts who evaluated defendant concerning the types of mental conditions from which defendant was suffering at the time of the crimes. Purisch agreed that defendant's PET scan and BEAM study showed abnormalities in defendant's brain, conditions that could be chronic. The battery of neuropsychological tests administered by Purisch showed that defendant had cognitive and other neuropsychological problems consistent with his brain impairment. Purisch concluded defendant suffered from organic personality syndrome of the explosive type, accounting for the long-term behavioral problems he demonstrated. He believed defendant had the disorder on the date of the crimes against Nadia, but because of defendant's many different versions of the events of that day, Purisch could not determine what defendant's state of mind was at the time of the crimes. Purisch did opine that with so many personality disturbances, defendant's defenses and intentions would get overwhelmed when he was under stress and that he would explosively "act out" in non-deliberated ways that he could not control. He concluded that defendant was under a great deal of stress, including from his job termination, on the day of the crimes.

17

A number of defendant's expert witnesses acknowledged on cross-examination that defendant could be malingering, that is, falsifying or exaggerating his psychological symptoms. Dr. LaCalle concluded that defendant was malingering, but testified he still had confidence in his expert opinions of defendant's mental illnesses. Dr. Berg did not diagnose defendant as a malingerer, but he did not rule it out. He found indications that could be considered malingering. Berg testified that defendant's bizarre actions during his trials — barking like a dog, turning counsel's table over, shaving his head — may have been calculated conduct by defendant, but that did not contradict the fact that defendant was also very mentally ill. Dr. Fossum did not diagnose defendant as a malingerer, although she had information in a report by a nontestifying expert, Dr. Edwards, that Dr. Edwards diagnosed defendant as a malingerer. Dr. Fossum noted in her report indications that were consistent with malingering. Dr. Purisch testified that defendant met the criteria for being a malingerer. He explained that although there was no evidence defendant malingered in his neurological testing, there was evidence he malingered on his personality testing and there were also other indications of malingering.

### 3. The prosecution's rebuttal evidence

Dalila Flores testified that when she was 15 years old and in high school, she met defendant at a Taco Bell where he was the manager. Defendant asked her if she wanted a job. She said she did and gave him her name and phone number. Approximately a week later, defendant called and said he had a job application for her. They arranged to meet at another Taco Bell the next day.

Flores testified that when she met defendant, he told her she needed to accompany him to his "apartment" to get the application. Defendant took her to a motel room after stopping to buy some wine coolers. Defendant never gave her a

18

job application or discussed a job application. He told Flores that when he had previously taken girls to the motel, he had stripped naked and they had photographed him before going to bed and doing "a blow job." When defendant asked Flores if she wanted to do the same, she said no. Defendant asked if she wanted him to show her a magazine like Playgirl or Playboy and she said no. Defendant then pushed her on the bed and tried to kiss her. Flores became frightened. She pushed defendant off, grabbed the wine cooler bottle defendant had been drinking, and told him: "Hey mother fucker, if you touch me you are dead." Flores told defendant she had cousins that were in gangs and they knew where she was, as did her brother and boyfriend. She told defendant that if he messed with her, they would mess with him.

Flores left the room and defendant followed her. She told him she was going home. Defendant apologized and offered to drive Flores home. Flores agreed, but asked to get out when they were about halfway to her house because she did not want defendant to know where she lived. She never saw defendant again.

### C. Sanity Phase

Defendant testified on his own behalf in the sanity phase of his trial, as follows.

Defendant explained that on March 20, 1989, he had only three hours of sleep before Scott called him back into work. When he arrived, Scott complained about defendant's work and told him she was going to have to replace him. Defendant thought he was fired. He left the Taco Bell restaurant and drove away upset because he thought this job had been his final opportunity. He bought and drank some beer. He thought about killing himself. He bought some drugs,

19

including cocaine, and checked into a motel around 11:00 a.m. He used the drugs and drank some more beer.

Defendant returned to the Taco Bell restaurant about an hour later, intending to "get back at" Scott, but there was too many people around her. He decided to go to the post office to see if his income tax refund check had arrived. It had not. As he walked back to his car, he had a conversation with a girl, who turned out to be Nadia. Defendant testified that he thought she was 19 or 20 years old. Nadia got into defendant's car. Defendant said he did not know why he took Nadia to the Inn, but denied it was for the purpose of sexual conduct. When Nadia was cleaning up his room, defendant took a bath and snorted more cocaine.

About 20 minutes later, defendant got out of the bathtub. As he reached for a towel, Nadia came in without knocking and saw him naked. This angered defendant, who grabbed Nadia. When Nadia kicked him, defendant became even angrier. They had a scuffle and ended up falling over the edge of the bathtub into the water. Defendant stayed on top of Nadia. Defendant claimed he did not have the power to get off of her, that he did not know what he was trying to do to her, and that he just did it. It was Scott he saw; not Nadia. When defendant rolled onto the floor, he saw Nadia was not moving and was hanging over the edge of the bathtub. She slipped into the water facedown. He turned out the lights and sat in the living room for five or 10 minutes.

When defendant went back into the bathroom, he knew something was wrong. He grabbed the mattress off the bed and placed Nadia onto it. Nadia had defecated and it smelled, so defendant pulled down her underwear and cleaned her off. Defendant wondered if Nadia was playing dead and to find out, he sodomized her. He testified he thought it was the right thing to do to see if she was alive.

Defendant claimed he thought he had killed Scott. He did not want to kill Nadia.

20

Defendant testified that the statements he made to the police when questioned were lies. He told them what they wanted to hear because they said they were going to shoot him. Defendant denied making up stories when he spoke to the doctors, but later admitted he was not truthful with Dr. Ronald Siegal because he wanted Siegal to leave him alone. He probably lied to Dr. LaCalle because he was angry with him. Defendant claimed Flores lied during her testimony.

Dr. LaCalle and Dr. Berg testified again at the sanity phase of defendant's trial. LaCalle concluded defendant's personality disorder severely impaired his ability to make proper decisions. Defendant's impairment was so extreme that he fell within the parameters of legal insanity at the time of Nadia's death and when he sodomized her. Berg also opined that defendant was unable to distinguish right from wrong and did not recognize the nature and quality of his actions at the time he committed the crimes against Nadia.

Defendant called two additional expert witnesses. Dr. Consuelo Edwards, a physician who specialized in psychiatry, testified defendant had multiple personality disorders and suffered from frontal and temporal lobe dysfunction for most of his life. She concluded defendant was legally insane when he committed the crimes against Nadia in an uncontrollable rage and without consideration of what he was doing. Dr. John Reid Meloy, a licensed psychologist specializing in forensic psychology, testified that he believed defendant did not understand the quality of his act of kidnapping Nadia and that when defendant raped and murdered Nadia he was incapable of distinguishing right from wrong.

The sole witness called by the prosecution at the sanity phase was Sergeant Gary Bruce of the Santa Ana Police Department. Bruce, who participated in the interrogation of defendant in San Antonio following his arrest there, testified regarding the circumstances of defendant's interrogation to rebut defendant's

21

testimony that he was threatened and intimidated during the questioning. Otherwise, the prosecution took the position that the jurors did not need the opinion of an expert on the specific issue of insanity and accordingly did not call its own experts to testify at the sanity phase. The prosecution closely cross-examined defendant's experts and in closing argument highlighted the fact that the defense experts' testimony was not always consistent regarding defendant's insanity. The prosecution also emphasized the testimony that defendant was a malingerer and an unreliable source of information.

The jury concluded defendant was sane at the time of the crimes.

### D. Penalty Phase

#### 1. *The prosecution's evidence*

At the penalty phase of trial, the prosecution called only one witness — Sara Puente, Nadia's mother, who provided victim impact testimony. The prosecution relied on the circumstances of the crime, including the victim impact testimony of Mrs. Puente, the incidents of violence against Lara and Esparza, and defendant's courtroom behavior during the sanity phase (defendant got out of his chair and advanced toward the prosecutor while uttering threats) as aggravating circumstances warranting the death penalty.

#### 2. *The defense evidence*

Defendant presented the testimony of 10 friends and family members regarding defendant's behavior when he was with them and their belief that his life should be spared. Defendant also presented the testimony of a sentencing consultant who testified defendant could adjust to life in prison if he was sentenced to life without the possibility of parole. Finally, defendant presented the testimony of a psychiatrist who testified to nine psychiatric factors regarding

22

defendant that he thought the jury should consider in determining defendant's sentence.[3]

## II. DISCUSSION

### A. Asserted Errors Affecting the Guilt Phase of Trial

*1. The prosecutor's use of peremptory challenges — defendant's* Wheeler/Batson *claim*

Defendant contends the trial court erred in denying his motion for mistrial brought under *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*). In the trial court, defendant asserted the prosecutor impermissibly used peremptory challenges to remove three Hispanic prospective jurors, one African-American prospective juror, and one prospective juror who described himself as "Mex-Blk" (Mexican-Black), based on their race. On appeal, defendant claims that the prosecutor's reasons for exercising his peremptory challenges against the five prospective jurors are not supported by the record and that the trial court failed to make a serious attempt to evaluate the genuineness of the prosecutor's explanation. Defendant contends his federal and state constitutional rights were violated and that reversal of the entire judgment is required. We reject defendant's claims.

A prosecutor's use of peremptory challenges to excuse prospective jurors on the basis of group bias, including on grounds of race or ethnicity, violates the

---

**3** The nine psychiatric factors were as follows: (1) defendant's abusive childhood experiences; (2) his premature exposure to sexuality; (3) his exposure to the odd religious beliefs of the *curandero*; (4) his childhood physical deformity (his eyes were deviated outward); (5) his history of head injuries; (6) his abuse of sedatives and stimulants; (7) his paraphilia or abnormal sexual development; (8) his history of experiencing psychotic phenomena during periods of stress; and (9) the progressive deterioration of his "life-functioning."

right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. (*People v. Clark* (2011) 52 Cal.4th 856, 903-904; *Wheeler*, *supra,* 22 Cal.3d 258.) Under *Batson, supra,* 476 U.S. 79, such practice also violates the defendant's right to equal protection under the Fourteenth Amendment. (*People v. Clark, supra,* at p. 904; *People v. Davis* (2009) 46 Cal.4th 539, 582.)

"In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted (*Johnson*).)" (*People v. Clark, supra,* 52 Cal.4th at p. 904.)

"A prosecutor asked to explain his conduct must provide a ' "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.] 'The justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*People v. Lenix* (2008) 44 Cal.4th 602, 613.) "[B]ut race-based decisions are not constitutionally tolerable." (*Id.* at p. 621; accord, *Rice v. Collins* (2006) 546 U.S. 333, 338.)

Therefore, "[a]t the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral

24

explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.]  In assessing credibility, the court draws upon its contemporaneous observations of the voir dire.  It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]" (*People v. Lenix, supra,* 44 Cal.4th at p. 613, fn. omitted, quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 339.)

" 'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.]  "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.]  We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" ' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 848.)

" ' "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." ' " (*People v. Stanley* (2006) 39 Cal.4th 913, 936.)  " ' "All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." [Citation.]  A reason that makes no sense is nonetheless "sincere and legitimate" as long as it does not deny equal protection.  [Citation.]' [Citation.]" (*Ibid.*)

" 'As part of our analysis, we consider as "bearing on the trial court's factual finding regarding discriminatory intent" [citation] the comparisons of prospective jurors challenged and unchallenged that defendant expounds in his briefs, though few if any of these comparisons were made in the trial court. At the same time, "we are mindful that comparative juror analysis on a cold appellate record has inherent limitations." [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." [Citation.]' [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 165-166.)

With these principles in mind, we turn to the circumstances in this case.

Defendant moved for a mistrial pursuant to *Wheeler/Batson* after the prosecutor exercised a peremptory challenge to exclude Prospective Juror M.L., who described herself as Hispanic. Defendant argued that the prosecutor was impermissibly excusing prospective jurors who were Hispanic or African-American. Defendant initially identified four such prospective jurors — M.L. and E.D., who were Hispanic, L.M., who was African-American, and R.M, who was both Hispanic and African-American. Defendant later added Prospective Juror A.M.-F., who identified himself as "Latin-American."

The trial court found a prima facie case was stated. It noted that of the 16 peremptory challenges exercised by the prosecution, the prosecutor had used five of them to exclude people who were either African-American or Hispanic. The

26

trial court stated that it was not obvious why the prosecutor excluded each of the identified persons. The court later explained that its statement was based on its lack of recall of the voir dire specific to these jurors at that time. Under the circumstances, the court concluded it would require the prosecution to justify its use of its peremptory challenges.

After a hearing, at which the prosecutor stated his reasons for excusing each of the five identified prospective jurors, the trial court found that the prosecutor had not used any of its peremptory challenges in order to excuse prospective jurors based on their race and denied defendant's motion.

We examine defendant's claims of error.

### a. The excusal of Prospective Juror L.M.

Prospective Juror L.M. identified herself in her jury questionnaire as "Black." She stated that she was 42 years old, a high school graduate, married, with two children in their early 20's and was employed as an office associate. The prosecutor justified his peremptory challenge to her based on her responses to oral voir dire.

The prosecutor stated that his first concern was Prospective Juror L.M.'s statement that she was looking forward to sitting on a capital case. He stated that because of the enormity of the decision in a capital case, he was skeptical or suspicious of anyone who was looking forward to sitting as a juror in such a case. He questioned whether L.M. might have a specific reason or agenda for wanting to be seated on the jury. Second, the prosecutor noted L.M.'s claim that she was not apprehensive about making a life-and-death decision in a capital case. The prosecutor said that, considered with the statement that she was looking forward to the decision, this comment raised the concern that L.M. did not fully understand the gravity of a juror's personal responsibility in a capital case. Third, in response

27

to questioning by defense counsel, L.M. said her daughter was taking psychology in college, but denied that she ever discussed any of her daughter's class work with her. The prosecutor expressed skepticism that a woman who has a college-age daughter living with her and who has knowledge of her daughter's career plans would never talk to her about class work. In light of the statements indicating she wanted to serve on the jury, the prosecutor inferred L.M. might be trying to avoid a challenge based on her having discussed psychology or psychiatry with her daughter. Fourth, the prosecutor noted L.M.'s inconsistent statements about the death penalty. L.M. indicated, in response to a question about whether she had ever taken a position with respect to the death penalty, that she recalled an instance where she had spoken with friends about the death penalty and she had taken the position that it was "wrong." When asked whether she had ever read anything about the death penalty, she said no. She did not recall the specifics of the situation in which she took the position that the death penalty was wrong. Asked how she felt about the death penalty, whether it was used too seldom, too often or just right, she stated that she had no opinion. This comment concerned the prosecutor because she had just stated that in one instance she had taken the position that it was wrong.

The trial court noted preliminarily that it is not improper for a prosecutor to use a peremptory challenge to excuse prospective jurors who are reluctant to impose or have reservations about imposing the death penalty even if they are not excusable for cause under *Wainwright v. Witt* (1985) 469 U.S. 412. The trial court also observed that both sides approach prospective jurors from different perspectives. When there are two possible ways to interpret a juror's response to questioning, it does not mean that the prosecutor's interpretation is necessarily unreasonable. The trial court noted that each side might interpret a response differently in light of its perspective.

28

With that in mind, the court observed that Prospective Juror L.M. never previously had been required to make any decision regarding life or death. She had no opinion as to whether the death penalty was used too often or too infrequently. The trial court found it significant that L.M. said she did not remember the Robert Alton Harris case, even though his execution the previous year was the first execution in California for 35 years and the case had received massive amounts of publicity. The trial court found the prosecutor was justified in having doubts about L.M.'s ability to deal with the death penalty and to give it serious consideration in this case. According to the trial court, L.M.'s answers regarding this responsibility reflected a lower level of concern compared to the average juror. In addition, the trial court found the prosecutor's reservations regarding L.M. were justified in light of her seeming lack of involvement and thought about the issue in the past, which the trial court found hard to believe. It determined that the prosecutor had stated a nonrace-related reason for excusing her.

The record supports the trial court's conclusion that the prosecutor's explanation of his excusal of Prospective Juror L.M. was race neutral and not pretextual. The trial court expressly considered the prosecutor's stated concern that L.M. did not completely understand the gravity of a juror's personal responsibility in a capital case and specifically discussed portions of L.M.'s voir dire responses that established a basis for the prosecutor's concern. We find no inconsistencies in the trial court's comments, which demonstrate "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered," and therefore, "are entitled to deference on appeal." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) A failure of a juror to appreciate the gravity of his or her responsibility in a capital case may be an adequate race-neutral basis for a peremptory challenge. (See *People v. Salcido* (2008) 44 Cal.4th 93, 140.) With

29

respect to the prosecutor's skepticism regarding L.M.'s claim to have never read anything about the death penalty and to have formed no opinion on whether it was used too often or too infrequently, the prosecutor relied on evidence in the record that L.M. specifically recalled an occasion on which she had taken the position that the death penalty had been imposed wrongfully. The prosecutor could reasonably view L.M.'s statements as inconsistent and indeed, the trial court itself doubted her veracity on this point. The trial court's comments reflect that it found the prosecutor's concern to be reasonable. The trial court did not separately address on the record the prosecutor's other two stated grounds for his excusal of L.M., but it did not have to do so. (*People v. Stanley, supra,* 39 Cal.4th at p. 936.)

Defendant contends, however, that the prosecutor's statement of reasons is undermined by a comparative analysis of Caucasian jurors who expressed views similar to L.M.'s, but who were not excused by the prosecutor. Defendant contends that Prospective Juror E.C. was at least as willing or eager to serve as a juror. A number of Caucasian prospective and seated jurors or alternate jurors, including C.S., R.D., G.J., G.P., A.S., M.H., M.W., and M.B., acknowledged that they had friends or loved ones with whom they did not discuss their work. Three Caucasian jurors, including seated Jurors T.B. and J.R., acknowledged they had never had to make any decisions concerning the welfare, health or life of another. Nine Caucasian prospective or seated jurors or alternate jurors, G.P., J.R., S.M., R.D., M.B., E.C., K.T., T.S., and C.F., were unfamiliar with the execution of Robert Alton Harris or had not considered the issue of capital punishment in any depth.[4]

---

[4]     Defendant also argues that we should disregard L.M.'s lack of experience in making life and death decisions and her failure to recall the Robert Alton Harris case because such reasons were offered by the trial court in support of the exercise

*(Footnote continued on next page.)*

We consider defendant's argument despite his failure to make it in the trial court, "but 'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.' " (*People v. Elliott* (2012) 53 Cal.4th 535, 561, quoting *People v. Lenix, supra,* 44 Cal.4th at p. 622.) "One of the problems of comparative juror analysis not raised at trial is that the prosecutor generally has not provided, and was not asked to provide, an explanation for nonchallenges." (*People v. Jones* (2011) 51 Cal.4th 346, 365.) Here an explanation is readily apparent from our review of the proposed comparative jurors: In many instances the other jurors' responses were materially distinguishable from the responses of L.M.[5] Furthermore, the prosecutor expressly stated that his challenge to each of

*(Footnote continued from previous page.)*

of the peremptory challenge by the prosecutor, but were never adopted by the prosecutor. (Cf. *People v. Booker, supra,* 51 Cal.4th at p. 166.) We do not view the trial court's comments as stating separate reasons for L.M.'s excusal. Rather, it appears the trial court was considering such points as supporting the prosecutor's statement of reasons.

[5] For example, defendant claims that Caucasian Prospective Juror E.C. was at least as willing, even eager, to serve as a juror, pointing to E.C.'s statement that she believed jury service is an experience everyone should have. However, E.C. explained that she believed this because it was a worthwhile educational experience to see how justice was actually served compared to television. Thus, her response did not indicate any eagerness to be on this particular jury. She did not state anything equivalent to L.M.'s statement that she was "looking forward" to serving on this jury. Moreover, E.C. responded to the court's question asking for her feelings about her ability to handle the responsibility of a penalty decision that she did not "relish the thought," but she believed she "would be capable to follow the law and make a decision." She further stated that "it is [an] awesome responsibility for anyone to sit through there and come up with a decision that they really believe it's right." "You have to be willing to listen to all of it." The prosecutor could have reasonably viewed her responses to be qualitatively different from those of L.M.

As another example, defendant also suggests seven Caucasian prospective jurors gave comparable answers to L.M.'s statement that she did not discuss her

*(Footnote continued on next page.)*

31

the identified prospective jurors was based on the cumulative or combined effect of all of his expressed reasons.  None of the jurors brought to our attention by defendant expressed a substantially similar combination of responses to the responses provided by L.M.  (*People v. Watson* (2008) 43 Cal.4th 652, 675-676 [none of the comparative jurors shared the combined characteristics relied upon by the prosecutor in excusing the juror].)  In order for a comparison to be probative, jurors need not be identical in all respects (*Miller-El v. Dretke* (2005) 545 U.S. 231, 247, fn. 6), but they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge.  Defendant's proposed comparative juror analysis does not establish that the prosecutor's reasons for excusing L.M. were pretextual.

### b.  The excusal of Prospective Juror E.V.

In his jury questionnaire, Prospective Juror E.V. identified himself as "Spinish [*sic*]."  He stated that he was married, 27 years old, a high school graduate, and had attended one year of community college studying art.  He was employed by a supermarket as a meat cutter.  Responding to the question asking for the ages, level of education, and occupation of any children, E.V. stated that he had one child who was seven years old and in first grade.  He made the mistake of entering his own occupation — meat cutter, as his child's occupation.

---

*(Footnote continued from previous page.)*

daughter's psychology course work with her daughter.  However, all of the proffered comparison jurors' statements were about not discussing the work of their friends or family members with such friends or family.  It is clear from the prosecutor's comments that he was not concerned generally about prospective jurors discussing other people's work with them, but concerned specifically that L.M. was hiding her discussion of *psychology* with her daughter to avoid providing a basis for a challenge.

32

The prosecutor stated the following reasons why he excused Prospective Juror E.V. with a peremptory challenge. He noted that E.V. was 27 years old. He had been working as a meat cutter for six and a half years. He had a son who was seven years old. Thus, from a relatively young age, E.V. had been absorbed by work and family. The prosecutor also noted E.V.'s level of education and that E.V. listed only "Hot V.W." when asked about the books he read for pleasure. The prosecutor explained that this was significant to him because the defense had 14 doctors appointed as experts and he anticipated that some of their testimony would discuss the most sophisticated brain-scanning techniques that currently existed. The prosecution did not intend to call any experts of its own in this area, but would be cross-examining and challenging the defense experts. The prosecutor felt it was important that jurors have a broader level of life experience than E.V., in terms of socialization, work history and level of education. The prosecutor also was concerned about E.V.'s ability to analyze, evaluate, and make independent judgments regarding massive amounts of psychological and psychiatric testimony. E.V. appeared somewhat deferential and the prosecutor thought that E.V. could very easily be overwhelmed by the kind and amount of testimony expected in this case. Finally, the prosecutor noted that when E.V. was asked whether he felt that some people have committed crimes that are so bad, so aggravated and so serious that the person has given up their right to live in our society, E.V. said, no, he did not feel that way. This response concerned the prosecutor.

The trial court found the prosecutor's justification race neutral and nonpretextual, based in part on E.V.'s responses regarding his life experience and ability to grapple properly with the issues. The court stated that it had made its own note that E.V. was not able to spell even his own ethnic origin correctly, that he made several other misspellings on the questionnaire, and that he answered the

33

question regarding his child's occupation with his own occupation. The court observed that E.V. appeared particularly susceptible to being led by the form of voir dire questions. E.V. was initially confused by the court's reading of the penalty phase instructions and it took some time for him to understand what was being discussed. The trial court wrote that E.V. was "not too bright, but seems fair." The trial court found that the prosecutor had a reasonable basis for concluding E.V. was not a strong person and might be overwhelmed by the anticipated mental health testimony and that this had nothing to do with E.V.'s race.

Defendant claims the prosecution's stated reasons are inherently implausible in light of the whole record because, he asserts, the record makes clear that E.V.'s life experience was broad enough that he would have made a suitable juror. Defendant contends the prosecutor did not challenge Caucasian Prospective Jurors and Jurors R.D., T.S., C.B., N.W., C.A., and S.S., who had similar levels of education, limited activities outside of work and light reading interests.

The record supports the trial court's evident view that the prosecutor had race-neutral and nonpretextual reasons for challenging E.V., including on the basis of his limited life experience, which constitutes a race-neutral explanation for a peremptory challenge. (*People v. Sims* (1993) 5 Cal.4th 405, 429; *People v. Perez* (1994) 29 Cal.App.4th 1313, 1328.) Importantly, as the trial court noted, the prosecutor combined the reservation about 27-year-old E.V.'s limited life experience with a concern about E.V.'s intellectual capacity. A concern with a juror's ability to understand the proceedings and anticipated testimony is another proper basis for a challenge. (*People v. Turner* (1994) 8 Cal.4th 137, 169; *People v. Muhammad* (2003) 108 Cal.App.4th 313, 322.) That E.V.'s responses and demeanor also suggested he would be unable to independently reach a judgment on the issues is a further permissible race-neutral ground for a challenge. (See

34

*People v. Jones, supra,* 51 Cal.4th at pp. 363-364 [a juror's demeanor may be a valid basis for a challenge, provided the demeanor-based reason is not pretextual].)  And, a prosecutor could be properly concerned by a juror's statement that he did not feel there were any crimes so aggravated and serious that a person had given up their right to live in our society.

Defendant contends a comparison of Caucasian seated and Prospective Jurors R.D., T.S., C.B., N.W., C.A., and S.S. with E.V. reveals that the prosecutor's stated reasons for excusing E.V. were nevertheless pretextual.

The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor.  (*Miller-El v. Dretke, supra,* 545 U.S. at p. 241; *People v. Lenix, supra,* 44 Cal.4th at pp. 621-622.)  In this case, S.S. was called into the jury box after the prosecutor and the defense had each exercised two peremptory challenges.  At the next opportunity to exercise peremptory challenges, the defense excused S.S. immediately after the prosecutor excused E.V.  The prosecution had remaining peremptory challenges at the time S.S. was excused, but never had an opportunity to excuse or accept S.S. as a juror before he was struck by the defense.  Therefore, a comparison of E.V. to S.S. under these circumstances lacks any probative value concerning the issue of intentional discrimination by the prosecutor.

Turning to the remaining Caucasian seated and prospective jurors identified by defendant, only Prospective Juror T.S. (29 years old) was of a similar age and had somewhat similar life experience to E.V.[6]  But nothing suggested T.S. lacked

---

[6]    Seated Juror R.D. was 67 years old; Prospective Juror C.B. was 60 years old; Prospective Juror N.W. was 37 years old; and Prospective Juror C.A. was 43

*(Footnote continued on next page.)*

the capacity to understand the anticipated expert testimony in this case or the ability to make an independent decision on the issues. In addition, T.S. never expressed a belief similar to E.V. regarding the consequences of serious crimes. Moreover, as the Attorney General points out, T.S. possessed other qualities that the prosecutor may have felt offset his youth and any lack of breadth in his life experience. For example, T.S. had a neighbor and friend who was a police officer. He had at one time wanted to be a police officer and he had been on two police ride-alongs.

A comparative juror review of T.S., R.D., C.B., N.W., and C.A., who were accepted by the prosecutor as potential jurors, does not establish that the prosecutor's excusal of E.V. was racially motivated.

### c. The excusal of Prospective Juror A.M.-F.

Prospective Juror A.M.-F. identified himself in his jury questionnaire as "Latin-American." He stated he was a 28-year-old sales associate. He had a bachelor's degree in psychology and had taken postgraduate classes or seminars on developmental psychology. He listed his three favorite books as I, Claudius and Claudius the God by Robert Graves and "Legitimacy Crisis for Liberal Democracy" by Habermas. He identified the most recent book he read for pleasure as Mein Kampf by Adolf Hitler.

The prosecutor prefaced his statement of reasons for excusing Prospective Juror A.M.-F. with the comment that A.M.-F. "did not appear" Hispanic nor did

---

*(Footnote continued from previous page.)*

years old. Each had more extensive life experiences, which included either military experience, jobs entailing analytical skills or supervisorial responsibilities, or they were pursuing higher education.

he have a surname that would indicate such heritage. The only thing indicating he belonged to such an ethnic group was the fact that he identified himself on his questionnaire as "Latin-American." The prosecutor then stated that he excused A.M.-F. because he had been a psychology major in college; he indicated on voir dire that he had taken 25 courses in the area of psychology; he had recently taken some postgraduate classes in psychology; and he was thinking of getting a master's degree in psychology. A.M.-F. had helped administer the Minnesota Multiphasic Personality Inventory (M.M.P.I.) and had taken classes with respect to that psychological test. The prosecutor felt A.M.-F. would have a predisposition toward accepting defense psychological evidence in this case as a valid and legitimate approach to answering questions that would be presented to the jury. He was concerned that other jurors might use him as a source of information during deliberations. The prosecutor stated that he also excused A.M.-F. because A.M.-F. indicated he had a sister who had been in and out of incarceration. Further, A.M.-F. had driven on a suspended license in violation of a court order or directive from the Department of Motor Vehicles. Finally, the prosecutor was uncomfortable with a person who derived pleasure from reading books by Adolf Hitler.

The trial court found that the prosecutor's fear that A.M.-F. might have a predisposition to accept the testimony of psychologists as an explanation for defendant's actions was justified in light of A.M.-F.'s major, the number of classes he had taken and the fact that he had administered the M.M.P.I. himself. The court concluded that A.M.-F.'s education in psychology, "which was far beyond the norm," provided a reasonable basis for the challenge.

We agree that A.M.-F.'s educational background, interest, and experience in the field of psychology was a race-neutral reason justifying his excusal. (*People v. Clark, supra,* 52 Cal.4th at p. 907 [prospective juror's college courses

37

in psychology and view that someone who commits murder must have " 'something wrong with them in their mind' " justified peremptory challenge]; *People v. Landry* (1996) 49 Cal.App.4th 785, 790-791 [that a prospective juror's educational background and experience in psychiatry or psychology might cause him to favor the defense constituted a valid explanation for his excusal].) Such excusal was not inconsistent with the prosecutor's expressed desire to seat jurors with the ability to understand and evaluate the anticipated mental health testimony. It is reasonable to desire jurors with sufficient education and intellectual capacity to thoughtfully consider anticipated expert testimony, but to reject jurors who have so much interest, education, and experience in the same field as the anticipated testimony that they are likely to have established views and predispositions regarding the testimony, which they might share with the other jurors.

Defendant contends the prosecutor's failure to excuse Caucasian Prospective Jurors and Jurors T.B., D.H., G.P., C.S., and D.B., who each had studied psychology, shows the prosecutor's excusal of A.M.-F. was not genuinely based on this factor. As defendant acknowledges, none of these jurors had studied psychology as intensively as A.M.-F. Jurors T.B., G.P., C.S., and Prospective Juror D.B had each taken a single psychology course in college. Juror D.H. listed psychology as her major when she attended a two-year college. But when questioned about it, she stated that she took a psychology course for only one year of her two years. These levels of background and interest do not compare to A.M.-F.'s 25 college courses, postgraduate classes and interest in a master's degree in psychology. That other Caucasian prospective jurors, who were not excused by the prosecutor, may have violated criminal laws or had family members who had criminal histories similar to A.M.-F. (two of the other reasons stated by the prosecutor for excusing A.M.-F.) does not make them comparable to

38

A.M.-F. when none of those jurors possessed A.M.-F's elevated level of education, interest, and experience in psychology.

The record supports the conclusion that the prosecutor excused A.M.-F. on a race-neutral basis.

### d. The excusal of Prospective Juror R.M.

Prospective Juror R.M. identified himself in his jury questionnaire as "Mex-Blk." He wrote that he was 37 years old, married, and employed as a manager of a retail store. He stated that he previously taught mentally handicapped children.

When asked to explain his reasons for excusing R.M., the prosecutor noted that R.M. initially stated that he had been a victim of crime and that because of that and the nature of this case, the prosecutor had a serious doubt whether he could be fair. The prosecutor pointed out that R.M. himself repeatedly indicated he might not be able to be fair and that he vacillated in his responses to questioning about his ability to handle the issues in this case. The prosecutor discussed R.M.'s responses to questioning about his prior victimization and questioned whether R.M. had resolved the issue with sufficient finality that it would play no part in his decisionmaking. The prosecutor also observed that R.M. was obviously very anxious, that he had a concerned and pained expression on his face, that at one point he seemed emotionally upset, and that he described himself as an emotional person. The prosecutor was concerned that R.M. would not be able to reach a decision at the penalty phase and that he might not be able to make a definite decision with respect to the psychological and psychiatric testimony. The prosecutor stated that he was also concerned with R.M.'s statements that he was not a strong advocate of the death penalty and that human life was the most precious thing, no matter what the person has done. Finally, the prosecutor was

surprised by R.M.'s response that he had never had occasion to contact or call medical staff for a medical emergency during the six years he taught extremely handicapped children in a facility in Arizona.

The trial court agreed with the prosecutor that Prospective Juror R.M. vacillated considerably. The court noted that R.M. said several times that he had serious doubts whether he could be a fair juror, but said he would try. Later, R.M. seemed more inclined to believe he could be fair, but still not without reservation. The court recalled R.M. saying that human life is most precious "no matter what this person has done." According to the trial court, although R.M. was not being asked about this case, his use of the term "this person" may have indicated he was improperly considering the question as it applied to defendant. The court felt that the prosecutor could rightfully be concerned by R.M.'s comment and that combined with R.M.'s vacillation, the prosecutor's challenge was justified — that is, race neutral and not pretextual.

Defendant argues the prosecutor's excusal of R.M. must have been racially motivated because R.M. consistently affirmed that he could set aside his feelings and judge the case fairly despite his initial concern about being able to be fair. Defendant also claims R.M.'s voir dire responses suggest that the prosecutor should have wanted him as a juror, but for his race, because R.M. made comments suggesting he was inclined to place the burden of proof on the defense.[7]

---

[7] Defendant points to the portion of R.M.'s voir dire in which R.M. states that there "would have to be a lot of evidence to prove there is no way that this person did it because of the charges." R.M. went on to indicate that based on his belief that "human life is the most precious thing," a lot would have to be presented to him to prove the innocence of a person charged with murder.

Although R.M. ultimately claimed to have resolved his doubts concerning his ability to be fair, the record supports the prosecutor's reservations on this point. In fact, the statements referenced by defendant support the prosecutor's doubt even if they suggest a possible orientation in favor of the prosecution. The statements certainly do nothing to call into question the prosecutor's stated concern regarding R.M.'s statements regarding his ability to be fair.

Moreover, the prosecutor also justified the challenged excusal on R.M.'s emotional state, which, as the prosecutor suggested, might indicate an inability to cope with the trial and deliberations. Concern that a prospective juror is extremely emotional and overwhelmed by outside stresses is a proper race-neutral ground for a peremptory challenge. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1124.)

Defendant again argues that the credibility of the prosecutor's statement of reasons is undercut by a comparative juror analysis. Defendant complains that the prosecutor did not challenge several Caucasian prospective jurors who expressed reservations about the death penalty. Defendant identifies Jurors T.B., J.R., and W.S., as well as Prospective Juror R.S., as being in this category. None of these jurors, however, questioned his or her own ability to be fair or appeared emotionally upset.

Finally, we note that, as part of his reason for excusing R.M., the prosecutor stated his surprise regarding R.M.'s claim to have never called for emergency medical services during the time he worked with disabled children. The prosecutor may have been questioning R.M.'s memory or his forthrightness. Either way, his concern was not so implausible as to reveal that the other reasonable grounds stated for his challenge constituted shams.

### e. The excusal of Prospective Juror M.L.

Prospective Juror M.L. identified herself in her jury questionnaire as "Hispanic." She stated that she was 22 years old, married, a high school graduate, and had a two-month-old child. She was employed as an office assistant at a county health care agency.

The prosecutor stated that he had a number of reasons for excusing M.L., but two were primary. First, M.L. answered "no" to the question on the jury questionnaire asking whether she or anyone close to her had ever been the victim of a crime against person or property. However, during individual voir dire, it was revealed that M.L.'s cousin in San Diego, with whom she was close, had been murdered. This caused the prosecutor serious concern because M.L. had answered the written question under penalty of perjury, and she did not disclose the information even when the court asked whether the jurors wanted to change anything in their questionnaires after listening to the questioning in court. The information came out only as a result of direct questioning. Second, M.L. wrote "no" to the question asking whether she or any relative or friend had been charged, arrested, indicted or convicted of any criminal offense. During voir dire, M.L. stated she understood the question, but she forgot to mention that her older brother had been arrested a number of times for what she considered to be minor offenses. This, coupled with M.L.'s failure to mention the murder of her cousin, caused the prosecutor to be concerned whether she was paying enough attention to the process and to her responsibilities. The prosecutor observed that it would be one thing to forget something that occurred long ago, but M.L. was only 22 years old, and these events affected immediate members of her family. The prosecutor wondered whether she had made a decision that she wanted to be seated on this jury. Finally, the prosecutor was concerned by M.L.'s statement on voir dire that she did not think it is right to impose the death penalty.

The trial court found the prosecutor's statement of reasons to be reasonable and credible. The court noted there was a basis for the prosecutor to be skeptical of M.L.'s explanation for the omission on her juror questionnaire. The trial court also confirmed that M.L. at one point stated she did not think it right to impose the death penalty, even though she later expressed a seemingly different view. According to the court, M.L. seemed like a person who vacillates and can be lead by a questioner. The court concluded the prosecutor did not excuse M.L. on the basis of racial or group bias.

Defendant contends the record does not support the prosecutor's argument that M.L.'s responses suggested she was not paying enough attention to the process or her responsibilities in the case. Defendant argues M.L. satisfactorily explained her failure to mention her cousin and brother in the jury questionnaire, and complains that a fair reading of the record shows M.L. supported the death penalty and could vote for it if she believed it appropriate. Moreover, as defendant previously argued, a number of Caucasian prospective jurors expressed some resistance to the death penalty, but were not excused by the prosecutor by way of peremptory challenges.

M.L.'s failure to disclose information in response to the jury questionnaire and her later claim of forgetfulness in explanation supply a factual basis for the prosecutor's concern that she was not paying enough attention to the process and to her responsibilities. A genuine concern that a prospective juror is not forthcoming or is not paying sufficient attention to the proceedings is a race-neutral basis for a peremptory challenge (*People v. Lenix, supra,* 44 Cal.4th at pp. 614, 628), as is a concern that a prospective juror may be substantially opposed to the death penalty. (*People v. Salcido, supra,* 44 Cal.4th at pp. 139-140; *People v. Pride* (1992) 3 Cal.4th 195, 229-230.) Here both were stated as grounds for the prosecutor's challenge and defendant points to no other Caucasian

prospective or seated juror or alternate juror who possessed these combined characteristics and who was not excused by the prosecutor. (*People v. Watson, supra,* 43 Cal.4th at p. 676.)

> *f. The trial court's assessment of the credibility of the prosecutor's stated reasons.*

We note that the trial court, in reaching its decision on defendant's motion, expressly recognized its duty to carefully evaluate the prosecutor's stated reasons in order to distinguish bona fide reasons from sham excuses belatedly contrived to conceal discrimination. As we have discussed, the court separately considered the prosecutor's basis for challenging each of the identified prospective jurors and determined that such reasons were adequately supported by the record.

In addition, the trial court relied on several case wide factors that it found relevant to its consideration of the motion. First, it noted that the same prosecutor had tried this case previously; the court was not aware of the prosecutor ever deliberately misleading the court about a matter of importance in that trial; the prosecutor did not use all of his peremptory challenges during that trial, and one juror who identified herself as Mexican-American actually sat as a juror in that trial. Second, the trial court noted that the victim, as well as the defendant, in this case was Hispanic, so it was unlikely the prosecutor would be concerned about minorities unduly identifying with the defendant. Third, the prosecutor questioned in depth all five of the prospective jurors at issue. Fourth, during this jury selection process, the prosecutor had accepted the jury several times when minorities were in the jury box. Indeed, there was one remaining minority prospective juror in the jury box at the time of defendant's *Wheeler/Batson* motion. The prosecutor had "passed" at least two times since this juror had been seated in the box. Considered in combination, the totality of these circumstances

44

convinced the trial court that the prosecutor had not used any peremptory challenge to exclude members of a racial group.

These case wide factors were appropriately considered by the trial court and further support its denial of defendant's motion. (*People v. Clark, supra,* 52 Cal.4th at p. 906 [circumstance that jury included member of identified racial minority is an indication of good faith in exercising peremptory challenges and an appropriate factor to consider]; *People v. Lomax* (2010) 49 Cal.4th 530, 576 [acceptance of panel containing African-American strongly suggests that race was not a motive in the challenge]; *People v. Lenix, supra,* 44 Cal.4th at p. 613 [court may rely on the common practices of the advocate in considering genuineness of stated reasons for challenge]; *People v. Reynoso* (2003) 31 Cal.4th 903, 926 [circumstance that defendant and murder victim are of the same race might be viewed as neutralizing any prosecutorial belief that jurors of the same race would be biased in favor of defendant].)

We reject defendant's claim of error in the trial court's denial of his *Wheeler/Batson* motion.

### 2. Dr. Anderson's testimony that defendant knew the difference between right and wrong when he killed Nadia

#### a. Background

Dr. Anderson testified on direct examination that he was requested to evaluate defendant under section 1026 (relating to pleas of not guilty by reason of insanity) and that such evaluation included a mental status examination of defendant. As a result of this examination, Anderson diagnosed defendant with schizoaffective disorder, a history of polysubstance abuse and a history of multiple head injuries. He also believed defendant has an organic personality disorder.

On cross-examination, Dr. Anderson conceded that the validity of his expert opinion was directly related to the accuracy of the information on which it

was based, including the honesty of defendant's interview statements. The prosecution questioned whether defendant may have been lying to Anderson during the interview. Anderson testified that he did not credit everything defendant told him during his interview, but he did not believe defendant was lying. Rather, he concluded defendant was repressing information and had selective recall. He thought defendant's statements regarding the crimes reflected a misconception of what was happening, over which defendant had no conscious control. Anderson believed defendant when defendant told him that he saw Scott in the bathroom, not Nadia, and that was when defendant decided to kill the child. He also believed defendant when defendant told him that he did not recall the act of drowning Nadia, but saw "a vision" of drowning her. Part of the symptoms of schizoaffective disorder is "distortion in reality testing."

Dr. Anderson testified defendant's schizoaffective disorder influenced defendant to kidnap Nadia because it made him more frustrated, more suicidal, and more depressed. According to Anderson, defendant's disorder also impaired his judgment, insight, and ability to control his inner impulses and frustrations. It also influenced his sexual assault on Nadia because having sex to test whether she was dead or alive, as defendant claimed he did, constituted disordered thinking.

Dr. Anderson testified that he formed the impression that defendant had recognized that Nadia was a little girl when he picked her up and drove her to the motel room. Anderson also believed that defendant perceived a little girl while he was with her in the motel room before Nadia was killed, including while he was sexually assaulting her. But, when defendant killed Nadia, Anderson believed defendant perceived a little girl, "but not totally." Defendant "still saw Mary [Scott], the face of Mary." Anderson explained that when defendant was actually killing Nadia, "he knew he was killing a person, but because of this extreme anger it just distorted his visual perception. . . . Yes, he knew it was a little girl, but he

46

actually did not perceive her at the time of the act fully as a little girl. He knew he was killing someone."

The prosecutor then asked Dr. Anderson if he concluded "that the defendant knew the difference between right and wrong when he killed [Nadia]?" Defendant objected that it was irrelevant, immaterial, and beyond the scope of direct examination. The trial court overruled the objection and Anderson answered: "Yes, sir, I feel — I feel at the time that — the fact that he did know the difference between right and wrong."

### b. Analysis

Defendant argues the trial court erred by allowing the prosecution to elicit Dr. Anderson's testimony that defendant knew the difference between right and wrong when he was killing Nadia because the evidence was relevant only to defendant's insanity defense. (§ 25, subd. (b).) According to defendant, the evidence was irrelevant (§ 1026, subd. (a)) to the only issue raised at the guilt phase by defendant's mental health evidence; that is, whether defendant actually formed the required specific intent, premeditated, deliberated, or harbored malice aforethought. (§ 28, subd. (a).) Defendant argues consideration of Anderson's assertedly irrelevant testimony at the guilt phase could only have misled and confused the jury. He also claims the testimony was impermissible under sections 28 and 29, which exclude expert testimony regarding a defendant's capacity to form a required mental state and expert testimony stating a conclusion that a defendant did or did not have a required mental state. (*People v. Coddington* (2000) 23 Cal.4th 529, 582.) Defendant claims the erroneous admission of the testimony had the effect of violating his federal constitutional rights under the Sixth, Eighth, and Fourteenth Amendments.

47

Section 1026, subdivision (a), provides in relevant part: "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, the defendant shall first be tried as if only such other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed."

As we recently explained in *People v. Mills* (2012) 55 Cal.4th 663, 671-672: "At a trial on the issue of guilt, '[e]vidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.' (§ 28, subd. (a); see [*People v.* ]*Saille* [1991] 54 Cal.3d [1103,] 1115-1117.) Thus, while the evidence of a defendant's mental state at the guilt and sanity phases 'may be overlapping' (*People v. Hernandez* (2000) 22 Cal.4th 512, 520), the defendant's sanity is *irrelevant* at the guilt phase and evidence tending to prove insanity, as opposed to the absence of a particular mental element of the offense, is *inadmissible* (§ 28, subd. (a); *People v. Haskett* (1990) 52 Cal.3d 210, 232; [*People v.*] *Wells* [(1949)] 33 Cal.2d [330,] 351)."

Dr. Anderson's testimony that defendant understood the difference between right and wrong was evidence going directly to the issue of sanity. (*People v. Mills, supra,* 55 Cal.4th at p. 671 ["Under the *M'Naghten* test, insanity is established if the defendant was incapable of knowing or understanding the nature and quality of the criminal act, or of distinguishing right from wrong."]; see *People v. Jablonski* (2006) 37 Cal.4th 774, 830-831.) For such purpose, it was irrelevant at the guilt phase of trial.

The Attorney General contends, however, that Anderson's testimony also had relevance to the guilt phase issues of defendant's actual mental state and because the jury was not instructed in the guilt phase as to the definition of sanity,

48

the jury would not have been misled or confused into considering the testimony for any purpose other than its relevancy to such mental state.

We need not resolve the question of whether the challenged testimony might have had some relevance in this particular case to the guilt phase issue of defendant's actual mental state. Any error in admitting Anderson's testimony over defendant's relevancy objection was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Fuiava* (2012) 53 Cal.4th 622, 671 [applying the *Watson* standard to the claim of erroneous admission of evidence].)

But for the single challenged statement from Dr. Anderson, all the guilt phase psychological evidence was directed at the appropriate question of whether defendant acted with the requisite mental state. Under these circumstances, the jury was unlikely to focus on and give any significance to one question and one brief answer by one of defendant's many expert witnesses regarding a subject that did not relate to any instruction the jury was provided at the guilt phase and that was given during the course of over three weeks of defense testimony. The prosecutor did not argue or rely on the statement during closing argument. To the contrary, the prosecutor actually questioned whether Anderson was credible at all and noted that he looked at the ceiling during his testimony instead of looking at the jurors. Certainly there is nothing in the record suggesting the jury had questions about or were confused by this fleeting mention of defendant's understanding of the difference between right and wrong.

Moreover, we note that the prosecution evidence concerning the issue of intent to kidnap showed planning activity in that defendant rented a motel room for two people and after unsuccessfully trying to entice Sandra C. into his car with a ruse about being a teacher, defendant successfully used the same ruse to get Nadia into his car. He drove Nadia directly to the motel room he had earlier rented. Evidence that defendant told the police later that he "wanted to do

49

something" with Nadia went to the sexual nature of his intent, and his sexual motivation also emerged when he said he thought she was "too young." Of course, the evidence also established that defendant raped and sodomized Nadia. In rebuttal, the prosecution introduced additional evidence regarding defendant's conduct with Flores — the use of a ruse to get a minor girl to a motel room for the purpose of sexual assault. There also was evidence of defendant's premeditated intent to kill. Defendant told the police that, at one point, Nadia started to scream and that he did not want anyone coming from next door because he would not be able to "explain all this." The evidence of the manner of death also demonstrated an intent to kill. It showed Nadia was asphyxiated as a result of having her chest compressed while she was bent over the edge of the bathtub, consistent with someone trying to silence her.

In order to counter this strong evidence of defendant's intent to kidnap Nadia for purposes of sexual assault, his intent to commit the charged sexual offenses, and his deliberate and premeditated intent to kill her, defendant presented the testimony of numerous lay witnesses and eight expert witnesses regarding his past behavior and mental disorders. The evidence was proffered in support of the inference that defendant's mental problems made it unlikely defendant formed the requisite mental states. The value of the evidence was reduced, however, because defendant had not presented a consistent version of the events on the day of the crimes or explanation of his actions to his mental health experts. Indeed, Dr. LaCalle acknowledged defendant gave him 14 versions of what happened when defendant killed Nadia. A number of defendant's experts testified defendant was malingering or that some of his testing, statements, or actions were consistent with malingering. Defendant's ex-wife, Esparza, testified concerning an incident in which defendant attacked her in the bathroom, bending

50

her over the bathtub with his knee on her chest, choking her, and saying "Die, die," — an incident that was eerily similar to the circumstances of Nadia's death.

Our review of the record persuades us that there is no reasonable probability the jury would have reached a more favorable verdict if the trial court had not allowed Anderson to answer this question. We reject defendant's constitutional claims because this case falls within the general rule that "violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides* (2005) 35 Cal.4th 69, 91.)

Defendant nevertheless contends that admission of the testimony violated sections 28 and 29,[8] and thereby denied him constitutional due process. "Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state." (*People v. Coddington, supra,* 23 Cal.4th at p. 582, fns. omitted; see *People v. San Nicolas* (2004) 34 Cal.4th 614, 662-663.)

---

[8] Section 28, subdivision (a), reads: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

Section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

Defendant did not object to the prosecutor's question based on sections 28 and 29. Nor did his stated objections (relevancy, materiality, scope of direct examination) make it obvious or otherwise fairly inform the trial court and the prosecution that defendant objected to the question because such testimony lay outside the boundaries set by these statutes. Defendant's claims on these specific grounds are, therefore, forfeited. (*People v. Partida* (2005) 37 Cal.4th 428, 431, 434-435.)

They are also meritless. Asking Dr. Anderson whether he believed defendant understood the difference between right and wrong when he killed Nadia did not seek evidence of defendant's *capacity* to form any mental state. (§ 28, subd. (a); see *People v. Smithey* (1999) 20 Cal.4th 936, 961.) Nor did the question elicit Anderson's opinion on the ultimate issue: whether defendant acted with, or lacked, a particular mental state. (§ 29; see *People v. Samayoa* (1997) 15 Cal.4th 795, 837.) Even assuming, without deciding, that section 29 extends to preclude expert opinion testimony that is tantamount to stating an opinion that defendant did or did not have the mental state required for the crime charged (*People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364; *People v. Czahara* (1988) 203 Cal.App.3d 1468, 1476-1477; but see *People v. Cortes* (2011) 192 Cal.App.4th 873, 910-911), Anderson's testimony was not such testimony. There was no violation of the provisions of sections 28 and 29.

### 3. Cross-examination of Dr. Fossum regarding her handling of interview tapes of a defendant in a previous case

#### a. Background

During cross-examination of Dr. Fossum, the prosecutor inquired about the subpoena duces tecum he sent for the records of her file in this case. Fossum testified that she responded to the subpoena by sending copies of all requested records to the court. She explained that she sent the records with a declaration

52

stating, "the attached records are a complete and true copy of all records pursuant to the subpoena," but she also sent a separate declaration notifying the prosecution that she had not sent certain equipment that she needed on a daily basis. Under further questioning, Fossum admitted that it was not only physical equipment that she failed to produce. She also did not send copies of the instructional booklet that accompanied the Rorschach test; the administration and scoring manuals for other tests; the directions for administering the psychological tests; seven "case books" of materials sent to her by the defense investigation firm, including defendant's diary and his autobiography; and copies of all items shown to defendant, including pictures. Fossum claimed she did not understand that the prosecutor wanted all of these materials, but admitted she did not call the prosecutor to discuss the necessity for her production of these voluminous records and materials. Instead, she contacted the defense investigator regarding the subpoena.

In a similar line of enquiry, the prosecutor asked Dr. Fossum if she took written notes when she interviewed defendant. Fossum testified that she made some handwritten notes, but she also entered notes directly into a laptop computer that she had with her. Later she transferred the information from the laptop onto a computer disk, which she loaded into her computer. She then copied the portions of her notes that she felt were relevant and psychologically significant into her report. She did not produce the full notes or print a hard copy of the material on the computer disks in response to the subpoena. Fossum did not know if she reused these particular computer disks, but stated she usually placed disks in a drawer where they would be available for later reuse. When asked why she did not send copies of the notes she took and put into her computer, she said, "I actually didn't think about it. I didn't think there was anything that wasn't in my report that was relevant to the case." She did not consider sending the disks.

53

The prosecutor then asked whether in a previous criminal case in which Dr. Fossum had been appointed to work as a defense expert, she had interviewed the defendant, tape-recorded the interviews, and then destroyed the tapes. Defendant objected that the prosecutor was seeking irrelevant and immaterial information. The prosecutor responded that the evidence went to bias. The court asked the parties to approach the bench and, after discussion outside the hearing of the jury, the court ruled that the questions would be allowed because they went to Fossum's credibility and tended to show her bias.

Dr. Fossum answered the prosecutor's renewed question by denying that she destroyed her interview tapes in the previous case. She explained that in response to a request for the tapes in that case, she sent copies of all the tapes still in her possession to the public defender, who then sent them to the district attorney's office. Fossum admitted that she did not know whether the tapes that she gave to the public defender constituted all of the tape-recorded interviews and testified that when she was asked about the tapes during the trial of the previous case, she admitted that it was possible that some of the tapes had been reused and no longer existed. She testified she did not know in fact whether that had happened.

On redirect examination, Dr. Fossum explained that she had responded to a subpoena duces tecum from the prosecutor's office in a prior case, and used the same procedure as she did here. That is, she offered to arrange for identical equipment to be viewed by the prosecution or to bring the equipment to court on the day she was going to testify. She did not receive any instructions from the prosecutor in response.

54

*b. Analysis*

Defendant contends the trial court prejudicially erred in permitting Dr. Fossum to be questioned regarding her handling of the interview tapes in the prior case. We find no abuse of discretion by the trial court in allowing the prosecutor to cross-examine Fossum on the matter.

The principles are well settled. "[T]he scope of cross-examination of an expert witness is especially broad[.]" (*People v. Lancaster* (2007) 41 Cal.4th 50, 105; Evid. Code, § 721, subd. (a).) "A party 'may cross-examine an expert witness more extensively and searchingly than a lay witness, and the prosecution [is] entitled to attempt to discredit the expert's opinion. [Citation.] In cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence. [Citation.]' [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 358.) The prosecutor may properly cross-examine a witness to show bias, prejudice, interest, hostility or friendship toward a party that would bear on the question of the credibility of the witness. (*People v. Williams* (2008) 43 Cal.4th 584, 634; see Evid. Code, § 780 [in determining credibility of a witness, the trier of fact may consider any matter that has any tendency in reason to prove or disprove the truthfulness of witness's testimony].) An expert's testimony in prior cases involving similar issues is a legitimate subject of cross-examination when it is relevant to the bias of the witness. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1165.) On appeal, we review the trial court's ruling on the scope of cross-examination for an abuse of discretion. (See *People v Farnam* (2002) 28 Cal.4th 107, 187-188.)

Here, the prosecutor's questioning went to evidence from which the jury could draw an inference that Dr. Fossum was biased. As noted, she had responded to his subpoena with less than all of the materials he requested. The prosecutor

also elicited testimony that she did not produce all of her notes, but only selectively included some of the notes in her report. The prosecutor's proposed questions concerning Fossum's handling of the interview tapes in the prior case were relevant to establish a basis upon which the jury could find that Fossum's failure to fully comply with the subpoena in this case was not the result of an innocuous misunderstanding or forgetfulness, but rather an expression of antipathy toward the prosecution.

We are persuaded by our reading of the record of the bench conference on defendant's objection that the prosecutor made a sufficient showing, based on a good faith belief that his inquiry would reveal bias, for the trial court to allow the proposed questioning of Dr. Fossum. The prosecutor stated that the basis for his question to Fossum about the prior case was a conversation he had with the prosecutor in the prior case who told him Fossum had testified to destroying interview tapes. Contemporaneous notes of an interview of a defendant can obviously be very significant and important, and the prosecutor reasonably believed it is relevant if such notes were not preserved and fully disclosed. Here there was evidence that Fossum had taken notes, but only selectively printed them. The prosecutor asserted it was relevant that she did the same thing on a previous occasion. When asked by the trial court if the prosecution had "ma[d]e an issue out of that" in the prior case, the prosecutor stated it was his understanding that "that's what she admitted during her testimony." Taken together, these comments represented to the court that the prosecutor had information from another prosecutor that Fossum was a defense expert in a prior trial during which she was asked about and admitted tape-recording her interviews of the defendant, selectively preserving and disclosing only portions of those interviews, and destroying the original tapes. The prosecutor later conceded that Fossum might have destroyed the tapes in the prior case inadvertently, but he argued the matter

56

was still relevant in cross-examination to assist the jury in evaluating the credibility or reliability of her testimony in light of evidence of asserted bias. As he explained, "[n]ow, we have got another case within 18 months where the raw data — okay — was not sent to the court pursuant to subpoena, was not printed out — okay — at all. . . . She may or may not have the disk. I will ask her, but I don't think it is a coincidence that the raw data is missing in two capital cases. And not just any raw data, but the interview of the defendant."

Contrary to defendant's argument, the prosecutor did not need to establish more in order to demonstrate that cross-examination of Dr. Fossum about her handling of the tapes in the prior case would be relevant to show her possible bias in this case. It was enough to show a good faith belief that Fossum had failed to preserve her original interview tapes of the defendant in the prior case, and that the prosecution had questioned her at trial about that failure. A rational inference that a jury could draw from such evidence would be that when Fossum handled the disks and notes in the present case, she knew that, as the prosecutor put it, her "raw data" of a defendant's interview was significant to the prosecution and should be preserved. A further possible rational inference would be that her failure in this case to copy or otherwise ensure the preservation of her full notes and to produce those materials in response to the subpoena reflected a desire to resist disclosure and potentially conceal source materials from the prosecution. The trial court did not abuse its discretion in ruling that the prosecutor was entitled to explore such potential bias as part of the cross-examination.

### 4. The trial court's ruling restricting Dr. Fossum's testimony correlating job loss to the commission of homicide

#### a. Background

Near the beginning of her testimony, Dr. Fossum testified that she was asked to analyze the extent to which events in defendant's workplace might have

57

triggered or led to the crimes against Nadia.  The prosecutor objected to further questions based on a lack of foundation, adding that the question called for speculation regarding to Fossum's qualifications to make such an assessment.  The trial court allowed the prosecutor to voir dire Fossum regarding her qualifications.

During the voir dire examination, Dr. Fossum admitted she had not published any paper with respect to the effect of workplace environment on homicides, and that she had not conducted any research with respect to the causal relationship between being fired and subsequently committing homicide.  Fossum claimed, however, that her graduate school doctorial level exams in psychological assessment and broad use of psychological assessment instruments tested her ability to validly and accurately assess the effect of a firing on subsequent conduct, including homicide.  The prosecutor renewed the objection to Fossum's qualifications and, continuing outside the presence of the jury, added that it was for the jury to decide the question of whether there was any link between defendant's job loss and the killing of Nadia.

Still outside the presence of the jury, Dr. Fossum described, in further support of her qualifications, her educational background, her training and clinical experience with respect to identifying and assessing various stressors that affected the behavior of her patients, her psychological and clinical evaluation of defendant, her previous qualification as an expert in approximately 50 to 75 cases and her testimony in the penalty phase of one other capital trial in which she considered the defendant's job loss in connection with his psychosocial history.  She testified that because there had been a limited number of workplace homicides since 1989, very few psychologists had come into contact with a patient who was fired and then killed somebody on the same day.  Nevertheless, she explained, a psychologist is capable of assessing the subject's psychological history and

58

commenting on his state of mind at the time he engages in a range of behaviors. She agreed she was a clinician, not a researcher.

The trial court indicated that although it was reluctant to exclude any expert testimony offered by the defense, it questioned whether the defense was asking Dr. Fossum about a subject that was sufficiently beyond common experience so that the trier of fact needed expert assistance. (Evid. Code, § 801.) The trial court believed that the jurors would already understand the importance of a job in a person's life and that job loss would be a significant factor in a person's mind. Jurors would already know that if a person felt he or she had been treated unfairly it could trigger a rage, such as prior testimony indicated defendant likely experienced at the time of the homicide. The trial court also questioned whether there was a sufficient showing of Fossum's special expertise to testify regarding job loss triggering a homicidal act. Based on these concerns, the trial court ruled Fossum would not be permitted to express an opinion linking defendant's firing from Taco Bell to the killing of Nadia.

After conferring with Dr. Fossum during an ensuing break in the proceedings, the defense informed the trial court that it had learned that Fossum, after being retained, had sought to gather all printed data and research material on the issue of a person being fired and then committing a homicide. The defense contended Fossum's research and investigation into this area would be helpful to the jury because it is very rare for anyone to become so enraged by being fired that he or she kills. The defense claimed Fossum could assist the jury by explaining that a person with defendant's brain or mental dysfunction would be affected by a firing more than the average person and could potentially react in the way defendant had. The trial court granted the defense request to make a further showing regarding Fossum's qualifications.

59

Once again testifying outside the presence of the jury, Dr. Fossum stated that she had extensive experience working in the clinical setting with people who had suffered job loss and that she had additionally sought to gather the available research material regarding the connection between being fired and committing an immediate homicide from the National Institute of Occupational Safety and Health. Fossum testified that in response to her search request, she was provided five news articles, but she felt that none was sufficiently pertinent to this case. She described one of the articles as a 1992 Wall Street Journal article regarding workplace homicide as the fastest growing form of murder in America. The other four articles referred almost exclusively to homicides committed by people such as customers or individuals robbing a store. None of the five articles concerned a person being fired and then committing violent crimes against strangers at another location.

The defense maintained that Fossum's research was relevant because it concerned the anger of workers expressed toward coworkers or supervisors, and there was evidence here that defendant's anger toward his coworker Scott could be "extrapolate[d]" to Nadia.

The trial court noted that the defense had already presented evidence that defendant's anger toward Scott led to the crimes against Nadia. The question, according to the court, was whether there was sufficient psychological evidence of a connection between a person being fired and that person's resulting anger being directed against a stranger, at a remote location at a later time, such that an expert's opinion would assist the jury in deciding whether defendant's anger at Scott or some other psychological problem caused him to kill Nadia. The court concluded that absent studies showing a relationship between a person's workplace problems and violent acts against people at remote locations and at another time, Dr. Fossum would not be telling the jurors anything that they could

60

not figure out for themselves. The court ruled that Fossum could express an opinion about defendant's state of mind at the time she interviewed him and whether that state of mind was likely to have been the same at the time of the crimes, but she could not state an opinion concerning whether his firing precipitated his rage at a different location several hours later sufficient to cause a violent criminal act against a stranger.

During Dr. Fossum's subsequent trial testimony, she testified that Scott's castigation of defendant on the day of the crimes triggered a decompensation of defendant's narcissistic personality, which distinguished that day from the earlier incident in which defendant took Flores to a motel room. The prosecutor objected and asked the jury to be admonished to disregard the testimony in light of the trial court's earlier ruling. At a sidebar, the court clarified its earlier ruling. The court explained that it never intended to say Fossum could not mention that defendant's job loss was a factor that contributed to his mental state or affected his personality disintegration "or something like that." Rather, what had been litigated and decided was that she could not draw on studies to testify in general about the effect of job loss on homicides in the workplace. The court clarified that its ruling would allow Fossum to testify that defendant's job loss contributed to his mental state, caused confusion, or caused decompensation, but she could not state that defendant's job loss caused the homicide.

With this understanding of the ruling, Dr. Fossum was asked without objection to describe some of the factors that distinguished defendant's frame of mind on the date of these crimes from the day he took Flores to a motel. Fossum responded that defendant did not appear to have "intrusive, massive rage" when he was interacting with Flores. On the day of the crimes, however, his intrusive affect or emotions, particularly the emotion of rage, led him to be unable to exercise control over his behavior. According to Fossum, defendant's being

61

severely castigated by a female authority figure, Scott, was exactly the opposite of what his "fragile narcissistic personality structure" required to remain intact, and the experience contributed to this emotional intrusion. The fact that defendant thought he was fired was "very definitely" a factor that contributed to such intrusion.

### b. Analysis

Focusing on the trial court's earlier statements of its ruling, rather than its final clarification of the scope of its restriction on Dr. Fossum's testimony, defendant contends the trial court prejudicially erred in excluding Fossum's testimony regarding the extent to which events in his workplace might have triggered or led to the charged offenses. In his reply brief, he acknowledges the trial court did not bar all evidence relating to whether events in his workplace contributed to the offense, but contends the trial court prejudicially erred in excluding Fossum's proposed testimony concerning how some people may be so affected by being fired that they commit homicide.

"Expert opinion testimony is admissible only if it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801, subd. (a).) 'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.' (Evid. Code, § 720, subd. (a).) ' "The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement." ' [Citation.] We review the trial court's ruling on the

admissibility of expert testimony for abuse of discretion. [Citation.]" (*People v. Watson, supra,* 43 Cal.4th at p. 692.)

The scope of the trial court's ruling was defined by its last clarification, which precluded Dr. Fossum from drawing on studies to testify in general about the effect of job loss on homicides and from stating directly that defendant's being fired "caused" him to commit the homicide. That clarification did not preclude defendant from asking Fossum her opinion concerning how events in defendant's workplace might have factored into his mental state on the day of the crimes, and indeed defense counsel proceeded to elicit such testimony from her. Fossum was allowed to testify without objection to factors that distinguished defendant's state of mind on the day of the crimes from the day he took Flores to a motel. Fossum opined that on the day defendant took Flores to a motel he did not have the intrusive amount of rage that he had on the day of the crimes. Fossum explained that defendant's rage on the day of the crimes led to the "decompensation of his narcissistic personality" and inability to control his behavior. She specifically testified that events from his workplace, that is, being castigated by Scott and "fired," were factors that contributed to this intrusive rage.

We find no abuse of discretion in the trial court's ruling. The court appropriately allowed Dr. Fossum to testify to matters within the scope of her qualifications as a *clinical* psychologist who had performed a psychological evaluation of defendant. It properly required Fossum to explain her views of the connecting links between defendant's workplace problems and his subsequent killing of Nadia. The trial court properly precluded Fossum from generalizing about how job loss may cause someone to commit a homicide because there was no basis shown for her to testify as an expert on such topic. Fossum conceded she was not a researcher. She acknowledged she had not published any paper regarding the effect of workplace environment on homicides and that she had

63

conducted no research concerning the effect of being fired from a job on a subsequent homicide. She admitted that the general articles she reviewed on the topic of workplace environment and homicide were not sufficiently pertinent to this case. That clinical experience with persons suffering a job loss and subsequently committing a homicide may be rare and that there was an absence of research studies in this area did not, as defendant proposes, serve to establish Fossum's qualifications to express an opinion concerning the general relationship between them. It suggests instead that expert opinion concerning this topic may not have been possible under the then current state of research.

5. *The trial court's restriction on the opinion testimony of lay witnesses*

Paul Shawhan, defendant's supervisor at USA Aluminum in 1988, was asked whether he observed anything about defendant or had conversations with defendant that he considered to be "abnormal." The trial court sustained the prosecutor's objection that the question was vague and ambiguous. The court ruled that a lay witness could not testify that something was "abnormal," but could testify that something was unusual. The defense subsequently asked Shawhan whether he ever observed defendant say or do anything unusual. Shawhan responded, as noted earlier, that defendant acted "like a self-appointed police officer," continually "reporting other people's little infractions." Shawhan testified that he eventually terminated defendant's employment because defendant got into a physical confrontation with another employee. According to Shawhan, the other employee was simply paying for his food at a lunch truck when defendant became upset, "jump[ed] up in his face and start[ed] making all kinds of motions like he [defendant] was going to do something." Shawhan stated that defendant seemed both angry and anxious. Shawhan also testified that defendant responded to being fired with a statement that "it was okay" because the Los

64

Angeles Police and Sheriff's Departments wanted him to go to work for them. Defendant claimed law enforcement departments were interested in people like him who possessed an "international passport."

Sam Morrison worked with defendant in 1982 at a telemarketing firm. He testified concerning behavior and statements of defendant that he characterized as "unusual" or "weird." For example, as we recounted earlier, Morrison explained that when business was slow, defendant would jump up on a desk, scream in the telephone, and then get down and run around the desk. Morrison described defendant as the "class clown" in the office. Morrison also thought it was unusual that defendant claimed to "ha[ve] women all over the country, all over the world." However, when Morrison was asked whether he ever observed defendant behave "impulsively," the trial court sustained the objection that the question called for speculation and lacked foundation.

The defense asked defendant's ex-wife, Esparza, whether defendant was wild, "savage-acting," or "out of control" when he and her brother fought at the couple's wedding reception. The trial court sustained objections that the questions lacked foundation and called for speculation. The court sustained objections on the same grounds when the defense asked Esparza for her opinion concerning the reason for defendant's attack on her. She was later allowed to testify without objection, however, that defendant said he had attacked her because of his jealousy. The prosecutor again raised the same objections when Esparza was asked if defendant had ever attempted to commit suicide during their marriage. The trial court sustained the objection at that time, but advised the defense to ask first about defendant's acts and then it might permit Esparza to express an opinion "depending on what combination appears." The defense asked Esparza if defendant ever threatened to commit suicide during their marriage. The trial court sustained an objection that the question was irrelevant.

65

In each of these instances, defendant contends the trial court prejudicially erred in disallowing the lay opinion testimony.

"A lay witness may express an opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony (Evid. Code, § 800, subd. (b)), 'i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed.' [Citation.]" (*People v. Hinton* (2006) 37 Cal.4th 839, 889.) Such a situation may arise when a witness's impression of what he or she observes regarding the appearance and demeanor of another rests on "subtle or complex interactions" between them (*ibid.*) or when it is impossible to otherwise adequately convey to the jury the witness's concrete observations. (*People v. Melton* (1988) 44 Cal.3d 713, 744; *People v. Manoogian* (1904) 141 Cal. 592, 595-597.) A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind. (*People v. Chatman* (2006) 38 Cal.4th 344, 397.) Matters that go beyond common experience and require particular scientific knowledge may not properly be the subject of lay opinion testimony. (*People v. Williams* (1988) 44 Cal.3d 883, 915; *People v. Williams* (1992) 3 Cal.App.4th 1326, 1333.) A trial court's ruling on the admission or exclusion of evidence is reviewed for abuse of discretion. (*People v. Thompson* (2010) 49 Cal.4th 79, 128.)

It is unnecessary for us to consider whether the trial court abused its discretion in any of the rulings defendant challenges because even assuming error, we conclude any error was harmless. Shawhan and Morrison were both allowed to testify to defendant's unusual behavior and statements. Esparza was allowed to testify that defendant said he attacked her because of his jealousy. Defendant was otherwise allowed to present the testimony of numerous witnesses regarding his life-long behavioral and mental problems and Dr. Anderson specifically testified

66

that defendant told him he spoke to Nadia about being suicidal. In addition, Anderson expressed his professional opinion that on the day of the crimes defendant was deeply depressed and suicidal. Indeed, the substance of all of the excluded testimony was before the jury either in slightly different forms from these witnesses or from other witnesses. Viewing the record as a whole, there is no reasonable probability the jury would have reached a more favorable verdict if the trial court had allowed Shawhan, Morrison, and Esparza to answer these defense questions. (*People v. Watson, supra,* 46 Cal.2d at p. 836; see *People v. McNeal* (2009) 46 Cal.4th 1183, 1202-1203 [applying the *Watson* standard to the claim of erroneous exclusion of evidence]; *People v. Benavides, supra,* 35 Cal.4th at p. 91 ["violations of state evidentiary rules do not rise to the level of federal constitutional error"].)

### 6. The trial court's admission of the hearsay evidence that defendant registered for two guests at the Ha'Penny Inn

Thomas Nixon, the assistant manager of the Ha'Penny Inn, was permitted to testify over defendant's hearsay objection that defendant registered for two guests when he rented a room at the motel on March 20, 1989. Nixon had no independent knowledge of events when defendant registered, but based his testimony on a receipt bearing his own initials that he prepared when defendant checked out. Nixon testified that the occupancy information appearing on the receipt would have been copied from a registration card bearing that information that had been prepared by a motel desk clerk at the time defendant checked in. That clerk did not testify.[9] Copies of defendant's motel registration card, room

---

[9] The clerk, Parley Kennelly, was on active duty in the Navy at the time of trial.

payment receipt, and key deposit return receipt were admitted into evidence. We treat defendant's trial objection to Nixon's testimony as also including an objection to the documentary evidence upon which his testimony was based. The number of guests in defendant's room was listed as "2" on each of these motel records. Each of the documents bore defendant's signature and he stipulated that he signed each of these documents on March 20, 1989.

Defendant contends the trial court prejudicially erred in admitting Nixon's testimony because the underlying motel records did not fall within any exception to the hearsay rule. We understand defendant also to argue that the trial court erred in admitting the three documents that were the basis for Nixon's testimony. We conclude the records and testimony were properly admitted.

The Evidence Code defines hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless it qualifies under some exception to the hearsay rule. (*Id.*, subd. (b).)

The trial court allowed Nixon to testify to the number of guests listed on the motel records because it determined that the number came within the exception for adoptive admissions.[10] We note that a trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception (*People v. Martinez* (2000) 22 Cal.4th 106, 120) and "[a] ruling on the

---

[10] The adoptive admission exception to the hearsay rule is stated in Evidence Code section 1221, which provides that "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

admissibility of evidence implies whatever finding of fact is prerequisite thereto[.]" (Evid. Code § 402, subd. (c).) We review the trial court's conclusions regarding foundational facts for substantial evidence. (*People v. Phillips* (2000) 22 Cal.4th 226, 236.) We review the trial court's ultimate ruling for an abuse of discretion (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008; *People v. Martinez, supra,* at p. 120), reversing only if " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Brown* (2003) 31 Cal.4th 518, 534.)

In *People v. Maki* (1985) 39 Cal.3d 707 (*Maki*), we considered the adoptive admission hearsay exception as it applied to a receipt and an invoice to which objections had been made that called into question whether the documents were what they purported to be. We concluded the trial court erred in admitting a signed car rental invoice and an unsigned hotel receipt as adoptive admissions of defendant Maki where there was no testimony regarding how the documents were prepared or their purpose. (*Id.* at pp. 709-711.) We explained that "to prove 'adoption' of a hearsay statement sufficient to make it admissible under section 1221, . . . it must be shown 'that the party to an action against whom a declarant's hearsay statement is offered as an adoptive admission, (1) had *knowledge* of the contents of *declarant's* statement, and (2) having such knowledge, has, *by words* or *other conduct,* manifested his adoption or his belief in its truth.' [Citation.]" (*Id.* at p. 712.) We concluded that Maki's signature would have constituted an adoptive admission "if it were shown that he had read over the document and signed it after doing so." (*Ibid.*) "This prerequisite for introduction of such evidence may be provided by testimony of a person describing the circumstances surrounding the signing of the document." (*Ibid.*)

Defendant claims *Maki* establishes the trial court's ruling in this case was error. We disagree. As we shall explain, there was substantial evidence from

which the trial court reasonably could infer that defendant knew he was being registered at the motel for two guests and that he adopted the registration card and receipts' representation to that effect by his signature on the documents.

Both Nixon and the office manager, Mrs. Kennelly, testified regarding the standard practice the desk clerks used when they prepared the registration cards and receipts as they checked guests in and out of the Ha'Penny Inn. Mrs. Kennelly testified she supervised the desk clerks and the front office procedures for the motel. She described the standard procedure for checking guests into the motel as follows: the desk clerk would hand the guest a registration card to fill out; when the registration card was returned, the clerk would ask the guest for photo identification; the clerk would compare and verify the guest's identity and written information with the signature, photo and information on the identification card; the clerk would request payment and fill out a receipt for the payment received. She explained that the motel wanted to know how many guests would be in the room because there was a different price for the room depending on how many people were staying in it. As defendant himself summarized her testimony on this point, "according to Kennelly, at the time of registration the motel employee generally requested that the guest state how many people were going to be in the room." Kennelly added that the staff accepted the registrant's response unless they saw that there were other people with the registering guest.

Nixon also testified about the standard procedure for checking guests in and out. According to Nixon, there were several documents that had to be completed whenever a guest checked in. Nixon stated that the motel staff would fill out the registration card, on which would be the rate for the room, plus the tax and the $10

70

key deposit.[11]  Then the staff would fill out a receipt for the room rental payment and the guest would sign the receipt.  Nixon testified that when a guest returned the room key, the motel staff would fill out another receipt, have the guest sign the receipt, and then return the key deposit.

Mrs. Kennelly and Nixon recognized some of the handwriting on defendant's registration card, specifically including the numeral "2" entered in the space provided for the number of persons staying in the room, and the handwriting on defendant's room payment receipt as belonging to Mrs. Kennelly's son, Parley, who was working as a part-time front desk clerk at the time of Nadia's death.  Mrs. Kennelly testified that there was formal training for front desk clerks, including Parley, adding that she had never found that Parley made mistakes when he registered guests at the motel.

Nixon was asked about the receipt for defendant's return of his key at check out and the return of defendant's $10 deposit.  Nixon identified the handwriting on that receipt as being his.  Nixon testified that when defendant returned his key at checkout, Nixon took the number "2" for the number of guests registered for the

---

[11]  Contrary to defendant's claim, the testimony of Nixon and Mrs. Kennelly concerning who would usually fill out the registration card is consistent when considered in connection with a review of the registration card admitted into evidence.  The registration card contains areas for the guest's name, address, vehicle details, employer and signature.  It is logical that such information was filled out by the registering guest, as Mrs. Kennelly described.  The registration card has another area labeled as for "management use only," which contains spaces for entry of the room number, rental rate, and payment information.  Another section of the card contains an area for accounting entries reflecting the applicable room charges, taxes, and deposits.  Space for the occupancy information is at the bottom of the registration card immediately below the section for the accounting entries.  It is logical these sections were filled out by the front desk clerk, as described generally by Nixon.

room from defendant's registration card and entered it on the key deposit return receipt, along with some other information, before defendant signed the receipt.

From the evidence of the motel's price structure and its standard registration practice, the trial court could reasonably infer that Parley, who had received formal training regarding his duties as a front desk clerk, obtained the information that two people would be staying in defendant's room from defendant when defendant checked into the motel, that Parley marked that information on defendant's registration card and room payment receipt, and that defendant signed the room payment receipt after it was completed by Parley. Because a motel guest would have a distinct financial reason to check that the motel did not register and charge him or her for more than the actual number of persons who would be occupying the room, a further reasonable inference could be drawn that defendant reviewed the documents to confirm the number of guests noted by the motel *before* paying for the room and signing the room payment receipt. In further support, Nixon copied the occupancy information from these records onto the key deposit return receipt and defendant signed this receipt as well when he checked out of the motel. By this signature, defendant also acknowledged the truth of the documents' statement and Nixon's testimony that at the outset he had registered for a room with double occupancy. Thus, reasonable inferences could be drawn from the evidence that defendant had knowledge that he was registered for two guests and that he adopted the truth of the occupancy information by signing the receipts after they were filled out by the clerks and reviewed by him. (*Maki,*

72

*supra,* 39 Cal.3d at p. 712.)[12]  The trial court did not abuse its discretion in admitting the occupancy number under the adoptive admissions hearsay exception.

Moreover, the motel records were also admissible under the hearsay exception for business records.  (Evid. Code, § 1271.)  Mrs. Kennelly testified the documents were made in the regular course of the motel's business at or about the time the transactions occurred.  (*Id.*, subds. (a) & (b).)  Both she and Nixon testified to the identity of the documents and their mode of preparation.  (*Id.*, subd. (c).)  Contrary to defendant's claims, their testimony is not conflicting and considered as a whole, the testimony regarding the motel's standard practice is sufficient to show "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness."  (*Id.*, subd. (d).)

We find no abuse of discretion by the trial court in allowing Nixon to testify that defendant registered for two guests at the Ha'Penny Inn based on the motel records.

### 7. *The special jury instruction regarding the trial court's role in the appointment and payment of defense investigators and experts*

A number of defendant's expert witnesses testified that they were appointed by the court at the request of the defense or to assist the defense.  The prosecution questioned them regarding the cost and payment for their services and several of them testified that the court "allowed" their payment or that the court paid them.[13]

---

[12]  Nixon's testimony that the motel did not have a procedure for "documenting" how many people were in a room does not establish that there was not substantial evidence to support these inferences.

[13]  For example, Dr. Kowell testified he made arrangements to be paid by the court; Dr. Berg was questioned at some length about the money he was receiving for his services; Dr. LaCalle testified he was appointed by the court to evaluate defendant, he later clarified he was appointed as an expert for the defense, he was questioned at length about his charges; Dr. Fossum testified she was appointed by

*(Footnote continued on next page.)*

73

Defendant requested the court to provide the jury with the same special instruction that the court had used in defendant's first trial, regarding the court's role in the appointment and payment of defense investigators and experts. The instruction stated that under the law an indigent defendant is entitled to apply to the court for public funds to employ investigators, experts and others who are reasonably necessary for the preparation or presentation of the defense. The instruction explained that the purpose for such a law is to ensure that an indigent defendant is not deprived of an effective defense because of his financial condition, in view of the circumstance that the investigation and presentation of the prosecution is paid for with public funds. The instruction also explained that the court "is involved in reviewing and processing the application, and in appointing the investigators, experts, and others who will assist the defense, only for the purpose of ensuring that the persons appointed are reasonably necessary for the preparation or presentation of the defense, and to monitor the fees to be paid to such investigators and experts to ensure that such fees are within the guidelines established by the Court for that purpose." Finally, the instruction directed the jury not to view either the court's approval of a request for or appointment of a defense investigator or expert as an indication that the court was taking any position with respect to the credibility of such person when he or she later testified and made it clear that it was up to the jury to determine the credibility of any such witness and the weight to be given their testimony.

*(Footnote continued from previous page.)*

the court to assist the defense and that a court order "allowed" payment of her fees; and Dr. Purisch testified he was appointed by the court at the request of the defense and was paid by the court.

74

The prosecution did not object to defendant's request for the special instruction, but asked the court for a modification. The prosecutor argued that to the extent the defense had emphasized the court's appointment of its experts and to the extent jurors might question whether the court was validating the credentials of those experts and examining and approving their fees, the instruction should make it clear that the court's approval was based on information submitted by the defense and not on its own independent review.[14]

Defendant contended the original instruction was superior and objected to the prosecution's proposed modification. Defendant argued the court did scrutinize his applications and that the court's approval was not simply based upon his request. Defendant pointed out that one expert, Dr. Anderson, was appointed by the court without being requested by him. Defendant also argued that the prosecution's proposed changes would suggest the defense "brought in all these doctors and [paid] them all of this money . . . without any approval of the court." Defendant claimed the prosecution was trying to cause the jury to infer that the defense "either gave false declarations or nobody checked the declarations and we

---

[14] The modification proposed by the prosecution retained all of the previous language of the prior instruction except for the paragraph regarding the court's role in reviewing applications. The prosecution proposed that language be amended to state: "*In these circumstances*, the Court is involved in reviewing and processing the application *submitted by the defense attorneys,* and in appointing the investigators, experts, and others *who have been asked by the defense attorneys to assist with the defense,* only for the purposes of ensuring that, *based upon the declarations submitted by the defense attorneys,* the persons appointed are reasonably necessary for the preparation or presentation of the defense. The Court is also involved to monitor the fees to be paid to such investigators and experts to ensure that such fees are within the guidelines established by the Court for that purpose." (Changes proposed by the prosecution are in italics.)

have run up thousands and thousands and thousands of dollars to defend this person."

The trial court agreed that "it [the appointment procedure] is not just an open checkbook." Nevertheless, the court felt that the prosecution's request was fair because the defense had, by making a point of the court's appointment of its experts, attempted to enhance the witnesses' credibility. The court prepared a slightly different version of the instruction, which it viewed as a compromise. The court's instruction provided, in relevant part: "The Court is involved in . . . reviewing and processing the application *submitted by the defense attorneys*, and in appointing the investigators, experts, and others *requested in the application*, only for the purpose of ensuring that the persons appointed are reasonably necessary for the preparation or presentation of the defense, and to monitor the fees to be paid to such investigators and experts to ensure that such fees are within the guidelines established by the Court for that purpose." (Changes made by the trial court are in italics.)[15] The court gave the instruction over defendant's objection to the modification.

---

[15] The full instruction given by the court stated: "Under the law an indigent defendant (or his attorney) may apply to the Court for public funds to employ investigators, experts and others reasonably necessary for the preparation or presentation of the defense. For this purpose a defendant is 'indigent' if he does not have the financial means to secure those services himself. The application is confidential until disclosed by the defense before or during the trial. The purpose of this law is to ensure that an indigent defendant is not deprived of an effective defense because of his financial condition, since the investigation and presentation of the prosecution is paid for with public funds.

"The Court is involved in the reviewing and processing [of] the application submitted by the defense attorneys, and in appointing the investigators, experts, and others requested in the application, only for the purpose of ensuring that the persons appointed are reasonably necessary for the preparation or presentation of the defense, and to monitor the fees to be paid to such investigators and experts to

*(Footnote continued on next page.)*

76

Defendant now claims the trial court erred in giving the instruction at all. Defendant contends it was reasonably likely the instruction unfairly highlighted the cost to the public of both prosecuting and defending him, thereby injecting an irrelevant and impermissible consideration into the jury's deliberations. The result, according to defendant, was that the jury was pressured or coerced into reaching a verdict of guilty to avoid the cost of another retrial. He relies on cases considering the giving of an *Allen* charge to a deadlocked jury. (*Allen v. United States* (1893) 150 U.S. 551; *People v. Barraza* (1979) 23 Cal.3d 675, 684-685; *People v. Gainer* (1977) 19 Cal.3d 835, 843-845, 852, fn. 16.) He also claims the instruction was misleading because the jury would have understood it to mean that the court must determine whether ancillary personnel were reasonably necessary, but not that the court was also required to determine whether their requested fees were reasonably necessary. Finally, defendant contends the trial court's modification was not supported by the evidence, but was based on the prosecutor's mistaken assertion that the defense had repeatedly elicited testimony that the expert witnesses had been appointed by the court, which insinuated that the court had validated their testimony, when in almost every instance the defense had made clear "the nature of the expert's appointment."

---

*(Footnote continued from previous page.)*

ensure that such fees are within the guidelines established by the Court for that purpose.

"Neither the approval of such a request, nor the appointment of such an investigator, expert, or other person by the Court to assist with the defense, should be taken by the jury as an indication that the Court has taken any position with respect to the credibility of such person when that person later testifies as a witness. It is for you, the jury, to determine the credibility [of] any such witness and the weight to be given to the testimony of such a witness."

The doctrine of invited error bars a defendant from challenging a jury instruction given by the trial court when the defendant has requested the instruction based on a " ' " 'conscious and deliberate tactical choice.' " ' " (*People v. Harris* (2008) 43 Cal.4th 1269, 1293.)  The doctrine applies here to bar defendant's challenge to the giving of the instruction because, despite his claims to the contrary, the record reflects defendant had and expressed a tactical reason for requesting the instruction.  That is, anticipating and responding to the prosecution's attempts to show bias by the defense experts due to their receipt of substantial fees for their services, defendant elicited testimony that the court appointed his experts and paid their fees.  Even though defendant clarified that, with the exception of Dr. Anderson, the experts were appointed to assist the defense at the request of defendant, it was clear that defendant elicited the testimony of their court appointment and payment in order to counter the inference that there was no objective oversight of their retention or payment.  During the instruction conference regarding the prosecutor's proposed modification to the special instruction, defense counsel stated: "We felt that with the appearance being presented by the prosecution, it was necessary to show more accurately that the court was involved and we could not just arbitrarily pick any doctor and pay any excessive or exorbitant amount of money."  The instruction addressed these concerns by informing the jury that the law provides for court appointment of defense experts for an indigent defendant to ensure he is not deprived of an effective defense because of his financial condition, that the court reviews defense applications for appointment of experts and appoints experts when they are reasonably necessary for the preparation or presentation of the defense, and that the court monitors the fees paid to the appointed experts to make sure the fees fall within court guidelines.  Defendant may not now complain that the trial court erroneously gave the instruction he requested.

78

The only claim properly preserved by defendant is his claim regarding the trial court's modification of the instruction in response to the prosecution's proposed changes. However, the instruction as a whole generally, and the language inserted by the court specifically, constituted an accurate statement of the law justified by the parties' presentation of the evidence. The trial court's modification tempered the language proposed by the prosecution to address defendant's expressed concerns. It is not reasonably likely that any juror would have understood or been influenced by the instruction in the manner suggested by defendant.

### 8. *The denial of defendant's request for a jury instruction limiting the jury's consideration of evidence of his prior wrongful acts*

During the guilt phase of trial, evidence was admitted of defendant's prior criminal acts. The prosecution introduced the testimony of third-grader Sandra C. regarding defendant's attempt to lure her into his car and the rebuttal testimony of Flores regarding defendant's actions in enticing her when she was 15 years old to accompany him to a motel where defendant proposed they engage in sexual conduct. Defendant introduced the testimony of his ex-wives, Lara and Esparza, regarding his sudden violent assaults on them. Lara testified that after defendant accused her of discussing her ex-boyfriend with a girlfriend, he initiated sexual activity, during which he stabbed her. Esparza testified that defendant attacked her, pushed her against the bathtub and then choked her while pushing her over its edge, and told her he was going to kill her.

Initially, both defendant and the prosecution requested that the trial court give CALJIC Nos. 2.50, 2.50.1, and 2.50.2, which instruct the jury that it may not consider such evidence as evidence of propensity or bad character, that it may properly consider the evidence for specified limited purposes, and that the prosecution has the burden to prove by a preponderance of the evidence any such

prior criminal misconduct. Defendant, however, later withdrew his request. The prosecution continued to argue the instructions were necessary to ensure the jury did not use the evidence as propensity or character evidence in violation of Evidence Code section 1101, subdivision (b). The trial court indicated it would give the instructions over defendant's objection, but would consider any modification he proposed.

Defendant argued it would be inappropriate for the court to instruct the jury with the pattern language of CALJIC No. 2.50 because the instruction would describe his prior acts as "crimes" when he had not been convicted of them. After discussion of the matter, the court modified the instruction to include language referencing prior "acts" as well as crimes.

Defendant raised another "troubling point" with the instruction. He noted that the defense had presented the testimony of Lara and Esparza regarding defendant's attacks on them for the purpose of showing defendant's mental defect, and that evidence of such attacks, along with the Flores incident, had been part of the records considered by the defense experts. As the proponent of the evidence, defendant claimed he was entitled to an instruction restricting consideration of that evidence to those stated purposes — consideration of defendant's asserted mental defects and for evaluating the expert testimony.

The court observed that the prosecution wanted to use the evidence to show defendant's criminal intent and that the defense was using the evidence to try to show he did not act with that intent because of his mental defects. The court stated that it did not matter who called the witnesses and that under these circumstances it was appropriate to give a modified version of CALJIC No. 2.50. Defendant agreed, but argued that the instruction should be further modified to state the additional purpose for which defendant introduced the evidence, i.e., to support the doctors' testimony regarding his mental defects. To address

80

defendant's concern, the trial court suggested removing the language that stated the evidence was introduced "for the purpose of" and substituting "which may show." Defendant agreed to the modification, but still objected to the instruction in its entirety. The court gave the instruction, as modified.[16]

Defendant claims on appeal that the trial court erred in failing to give the limiting instruction the defense requested, but it is difficult to understand the precise nature of the error he asserts. Defendant begins by stating that the trial court erred in failing to instruct the jury that it could consider Lara's and Esparza's testimony "only to the extent it was relied upon by the expert witnesses as evidence of [defendant's] mental defect." This argument — that Lara's and Esparza's testimony was relevant solely as a basis for the defense experts'

---

[16] CALJIC No. 2.50, as given in this case, read: "Evidence has been introduced which may show that the defendant committed crimes or acts other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] The existence of the intent which is a necessary element of the crime charged; [¶] The identity of the person who committed the crime, if any, of which the defendant is accused; [¶] The defendant had knowledge or the means that might have been useful or necessary for the commission of the crime charged. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

CALJIC No. 2.50.1, as given in this case, read: "Within the meaning of the preceding instruction, such other crime or act purportedly committed by a defendant must be proved by a preponderance of the evidence. You must not consider such evidence for any purpose unless you are satisfied that the defendant committed such other crime or act. [¶] The prosecution has the burden of proving these facts by a preponderance of the evidence."

CALJIC No. 2.50.2 defines the term "preponderance of the evidence." It concludes with the admonition that the jury "should consider all of the evidence bearing upon every issue regardless of who produced it."

81

opinions — appears to assert that the trial court erred in instructing the jury pursuant to CALJIC No. 2.50 that the jury could consider the testimony for the purpose of determining the existence of the requisite criminal intent. But in a footnote, defendant contends his claim is not that the trial court erred in giving CALJIC Nos. 2.50, 2.50.1 and 2.50.2, as modified. He agrees that the instructions were necessary and properly given. Rather, he contends that the instructions were incomplete. Defendant further argues, however, that without a limiting instruction restricting the jury's consideration of the testimony of Lara and Esparza solely to its function as the basis for the defense experts' opinions regarding defendant's mental illness, the jury was improperly allowed to consider the evidence as substantive evidence of his prior acts of misconduct. Thereafter, arguing that the jury was reasonably likely to believe CALJIC No. 2.50 applied to only the prosecution's evidence, defendant contends the jury was likely to use defendant's evidence "as propensity evidence or for some other improper purpose." Without a limiting instruction, defendant continues, it is reasonably likely the jury did not understand that the testimony of Lara and Esparza constituted evidence of mental illness within the meaning of CALJIC No. 3.32. Defendant argues the trial court's error was not cured by any of the other instructions, but that prejudice was actually exacerbated by CALJIC No. 2.50.1, which told the jury that "[t]he *prosecution* has the burden of proving these facts [referred to in CALJIC No. 2.50] by a preponderance of the evidence." (Italics added.) In defendant's view, this language made it even more likely that the jury would believe CALJIC No. 2.50 applied only to the testimony of Flores, who was called by the prosecution.

Noting that on appeal defendant does not challenge the giving of CALJIC Nos. 2.50, 2.50.1, and 2.50.2, the Attorney General contends defendant failed to preserve his claim that the trial court should have further modified CALJIC No. 2.50 or given an additional clarifying instruction. (*People v. Hillhouse* (2002) 27

Cal.4th 469, 503 ["A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial."].) Defendant replies that his arguments to the trial court and objection to CALJIC No. 2.50 were sufficient to preserve his claim. We are not convinced that the specific claims defendant now makes were adequately articulated to the trial court at the guilt phase of trial to be preserved for appeal, but assuming that we may reach them (§ 1259), we conclude they are meritless.

To the extent defendant argues that a jury's consideration of evidence is limited to the purpose intended by the party who introduced it, we reject the contention. The rules of evidence govern the purpose for which evidence may be considered, and defendant cites no rule that suggests the testimony of Lara and Esparza could be considered solely for its impact on or support for the defense experts' opinions. Regardless of which party presents the evidence, and in the absence of some other applicable legal restriction, the jury is free to consider evidence for any relevant purpose. Here, as the jury was instructed, the evidence of defendant's prior assaults on Lara and Esparza was subject to the legal restriction that it could not properly be considered by the jury as propensity or character evidence, but the evidence was relevant to and could be considered by the jury as substantive evidence of defendant's intent when he committed the charged crimes. The trial court did not err by failing to restrict the jury's consideration of the evidence solely to its function as the basis for defendant's experts' opinions.

We further reject defendant's claim that the jury was likely to understand the modified CALJIC No. 2.50 given here as applying only to prosecution evidence and as a result, that it was reasonably likely the jury would consider Lara's and Esparza's testimony for the purpose of establishing defendant's

83

criminal propensity, notwithstanding the modified CALJIC No. 2.50 instruction. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 214 ["When reviewing [assertedly] ambiguous instructions, we inquire whether the jury was 'reasonably likely' to have construed them in a manner that violated the defendant's rights."].) CALJIC No. 2.50 properly informed the jury that it could not use evidence of defendant's prior crimes or acts as reflecting defendant's bad character or disposition to commit crimes and identified the limited purposes for which the evidence could be considered. The instruction did not distinguish between evidence of bad acts introduced by the prosecution and evidence of bad acts introduced by the defense. In fact, the trial court deleted language that defendant argued could suggest the instruction was limited to evidence introduced by the prosecution and defendant agreed with the court's modification. Even read in conjunction with CALJIC No. 2.50.1, it is not reasonably likely that the jury would have understood the restrictions of CALJIC No. 2.50 to be limited to the prosecution's evidence. CALJIC No. 2.50.1 addresses the entirely separate matter of the prosecution's burden of proof regarding a defendant's prior criminal misconduct. It does not address the proper use of the evidence if the jury finds it to have been proved. No jury would have understood it to alter or limit the rule expressed in CALJIC No. 2.50.

Finally, we reject defendant's claim that without an additional limiting or clarifying instruction, it is reasonably likely the jury did not understand that the testimony of Lara and Esparza constituted evidence of mental illness within the meaning of CALJIC No. 3.32 (evidence of mental disease is received for limited purpose of determining whether the defendant actually formed a required specific intent). The defense experts testified regarding defendant's mental illness as reflecting on defendant's intent at the time he committed the crimes. Drs. Berg, LaCalle, and Purisch specifically considered reports of defendant's attacks on Lara

and Esparza as supporting their diagnoses of defendant's mental illness. The jury was properly instructed that it could consider evidence of defendant's prior criminal misconduct for the issue of intent. And defense counsel drew the connection for the jury in closing argument, arguing that defendant has a legitimate mental illness that has existed throughout his life, that all the experts agreed he had such mental illness on the day of the charged crimes, and that as a result of his mental illness he was not thinking when he was with Nadia. Instead, counsel argued, defendant was in a trance-like state, just like he was when he stabbed Lara, and that he panicked afterward, just like he did in the incidents with Lara, with Esparza, and on other occasions. The jury would have understood from such arguments how defendant believed his prior assaults on Lara and Esparza supported his claim of mental illness and lack of criminal intent.

The trial court did not err in giving CALJIC No. 2.50 as modified or in failing to give a further limiting instruction regarding Lara and Esparza's testimony describing defendant's prior assaults on them.

### 9. *The trial court's instruction of the jury on first degree murder*

Defendant contends the trial court erred in instructing the jury on first degree murder because the information charged him only with one count of murder in violation of section 187, subdivision (a). He characterizes that provision as a statute defining second degree murder. Because, according to defendant, the information charged only second degree murder, the trial court lacked jurisdiction to try him for first degree murder. Defendant's argument is premised on his reading of *People v. Dillon* (1983) 34 Cal.3d 441. The argument is a familiar one that we have rejected many times. We do so again for the reasons previously expressed. (*People v. Howard* (2010) 51 Cal.4th 15, 35; *People v.*

*Bramit* (2009) 46 Cal.4th 1221, 1237-1238; *People v. Harris, supra,* 43 Cal.4th at pp. 1294-1295; *People v. Morgan* (2007) 42 Cal.4th 593, 616.)

Defendant also contends the information failed to allege all the facts necessary to subject him to punishment for first degree murder, including the death penalty, rendering his conviction defective under *Apprendi v. New Jersey* (2000) 530 U.S. 466, 476 (*Apprendi*).  As we stated in *People v. Harris, supra,* 43 Cal.4th at page 1295:  "The *Apprendi* claim is illusory; the information included special circumstance allegations that fully supported the penalty verdict."

## B.  Asserted Error Affecting the Sanity Phase of Trial

*The trial court's failure to modify CALJIC No. 4.01 as requested by defendant*

CALJIC No. 4.01 informs the jury that "[a] verdict of 'not guilty by reason of insanity' does not mean the defendant will be released from custody."  The instruction briefly explains the procedures that would be followed in the event of such a verdict; admonishes the jury determining the defendant's sanity at the time of the crimes not to consider what might happen to the defendant under such procedures; directs the jury to assume (if it determines the defendant was insane at the time of his or her crimes) that the "officials charged with operation of [the] mental health system will perform their duty in a correct and responsible manner, and that they will not release . . . defendant unless [he] can be safely returned into society"; and informs the jury that it would be a violation of its duty to find the defendant sane at the time he committed his offenses "because of a doubt that the Department of Mental Health or the courts will properly carry out their responsibilities."  (*Ibid.*; see also CALCRIM No. 3450.)

CALJIC No. 4.01 was drafted in response to two appellate court cases (*People v. Moore* (1985) 166 Cal.App.3d 540; *People v. Dennis* (1985) 169 Cal.App.3d 1135), which found that on request of the defendant or jury, the trial

court must instruct regarding the consequences of a not guilty by reason of insanity verdict.[17] (*People v. Kelly* (1992) 1 Cal.4th 495, 538.) The purpose of the instruction is "to aid the defense by telling the jury not to find the defendant sane out of a concern that otherwise he would be improperly released from custody." (*Ibid.*; accord, *People v. Moore, supra*, at p. 554.)

Defendant requested the trial court give CALJIC No. 4.01 in this case, but objected to the inclusion of the standard language informing the jury that a defendant who has been found not guilty by reason of insanity and who is determined by the courts not to have fully recovered his sanity could be placed "in outpatient treatment."[18] Defendant contended the language was not appropriate in light of statutorily mandated inpatient treatment for a minimum of 180 days in specified cases, including murder, kidnapping, rape, and a lewd and lascivious act

---

**17** There is no trial court duty to give such an instruction on its own motion when the defendant indicates he or she does not want the instruction. (*People v. Jones* (1997) 15 Cal.4th 119, 179, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) A defendant reasonably can choose not to request the instruction "for fear it might focus the attention of the jury upon the possibility of the defendant's release if he is restored to sanity." (*People v. Jones, supra,* at p. 179.)

**18** The standard language of CALJIC No. 4.01 provides, in pertinent part: "A verdict of 'not guilty by reason of insanity' does not mean the defendant will be released from custody. Instead, [he] [she] will remain in confinement while the courts determine whether [he] [she] has fully recovered [his] [her] sanity. If [he] [she] has not, [he] [she] will be placed in a hospital for the mentally disordered or other facility, *or in outpatient treatment*, depending upon the seriousness of [his] [her] present mental illness. [¶] Moreover, [he] [she] cannot be removed from that placement unless and until the court determines and finds the defendant's sanity has been fully restored, in accordance with the law of California, or until the defendant has been confined for a period equal to the maximum period of imprisonment which could have been imposed had [he] [she] been found guilty." (Italics added.)

87

upon a child.  (See § 1601, subd. (a).)  The prosecutor requested the standard language be retained, arguing that the instruction would otherwise not correctly reflect the law.

The trial court concluded that removing the language regarding outpatient treatment placement would be misleading because the next paragraph of CALJIC No. 4.01 would then inaccurately indicate that defendant could never be removed from mental hospital placement until he had either recovered his sanity or served the maximum period of confinement that could have been imposed had he been found sane.  (See fn. 18, *ante*, at p. 87.)  To address defendant's concern, the court decided to modify the standard language of the instruction to indicate that a defendant's placement in outpatient treatment would depend "upon the seriousness of his present mental illness *and the seriousness of the crimes for which he has been convicted in the guilt phase of the trial*."  (Italics indicate language added by the trial court.)  Defendant complained that the modified language was misleading because it continued to imply that outpatient treatment would be available to him if he was determined to be insane.  Defendant objected that the instruction failed to explain, given the crimes for which he was convicted, that there would be a mandatory period of inpatient treatment.  Defendant repeated his request for the instruction, but continued to object to the language regarding outpatient treatment. The trial court overruled the objection.

Defendant contends the trial court's ruling was error.  We disagree.

When a defendant is determined to have been insane at the time of an offense, section 1026, subdivision (a) provides that "the court, unless it shall appear to the court that the sanity of the defendant has been recovered fully, shall direct that the defendant be confined in a state hospital for the care and treatment of the mentally disordered or any other appropriate public or private treatment facility approved by the community program director, *or the court may order the*

*defendant placed on outpatient status* pursuant to Title 15 (commencing with Section 1600) of Part 2." (Italics added.) A defendant committed by a court to a state hospital or other treatment facility under section 1026 may later be placed on outpatient treatment status in accordance with the provisions of section 1600 et seq. (§ 1026.1, subd. (c); see *People v. Sword* (1994) 29 Cal.App.4th 614, 619-620.) To delete the reference in CALJIC No. 4.01 to possible outpatient treatment placement would be inaccurate in light of these statutes, which were applicable to defendant if the jury found him not guilty by reason of insanity. And, as the trial court noted, deletion of any reference to outpatient treatment placement in the first paragraph of CALJIC No. 4.01 would make the second paragraph misleading. The trial court did not err in rejecting defendant's request to remove the reference to outpatient treatment from the instruction.

Nor did the trial court err in refusing defendant's request to include language specifically advising the jury that the law (§ 1601, subd. (a)) mandated inpatient treatment for a minimum of 180 days for defendants found not guilty by reason of insanity of certain offenses, including most of the crimes of which defendant had been found guilty in the guilt phase of trial. The purpose of CALJIC No. 4.01 is to ensure the jury does not improperly find a defendant sane based on a fear that the defendant will otherwise "walk free." (*People v. Moore, supra*, 166 Cal.App.3d at p. 554.) The purpose is not to give the jury a detailed summary of the outpatient placement procedures and requirements, which are not relevant to the jury's task of considering the defendant's sanity at the time of the offense. (See *People v. Beames* (2007) 40 Cal.4th 907, 932-933 [in response to jury's question, trial court need not instruct on law of commutation exhaustively; details of commutation process are not relevant to jury's task].) CALJIC No. 4.01 adequately accomplishes its purpose by telling the jury a verdict of not guilty by reason of insanity "does not mean the defendant will be released from custody,"

informing the jury of the general scheme of the applicable mental health laws, specifically instructing the jurors not to consider "what happens to the defendant under these laws" in deciding the defendant's sanity at the time of his crimes, and assuring the jury that defendant will not be released unless the appropriate officials determine "he can be safely returned into society." The trial court's modification here provided additional assurance to the jury that the seriousness of defendant's crimes would impact any consideration of outpatient treatment placement. To have added further specific information regarding the mandated inpatient treatment for a minimum of 180 days under section 1601, subdivision (a), would have invited just the kind of jury speculation about the defendant's possible early release from confinement that the instruction was designed to forestall. (See *People v. Dennis, supra,* 169 Cal.App.3d at p. 1141, fn. 14 ["jury can no more be concerned with the possible length of a defendant's commitment than with the possible length of a prison term"].)

Because there was no error in the trial court's instruction, defendant's constitutional rights of due process and jury trial were not violated.

### C. Asserted Error Affecting the Penalty Phase of Trial

*Alleged* Caldwell *error in prosecutor's argument*

During the second part of his penalty phase closing argument, the prosecutor told the jury that he would like to spend a few minutes on some sociological and philosophical considerations. He referred to John Locke's theory of the social contract, in which Locke tried to explain the purpose of the rule of law. The prosecutor said that "[i]n the old days it used to be if someone stole my horse, I would go steal his horse. Or if someone assaulted my son, I would go assault his son." But, said the prosecutor, "a long time ago, individuals basically handed over their rights, certain rights to the government. And among those rights

90

were the rights to seek redress for wrongs.  And they said, 'We as individuals are going to let, in effect, society speak through our laws.  We are going to have a set of laws.' "  The prosecutor went on to explain that now when a person is a victim of crime, giving as an example a car theft, the person expects there to be a law to correct that wrong and for the perpetrator, if caught, to be punished in a manner commensurate with the type of wrong committed.  The prosecutor told the jury, "[y]ou have that expectation because you are part of that compact or that agreement.  We all are.  That's what it is, and we have the expectation that the law in California will be carried out."  However, the prosecutor continued, "the government has decided in this one case — in this one case in the State of California, we are going to take that right back and we are going to give it back to the people.  And that's what you have, the right of punishment and sentencing in a capital-type case.  [¶]  And it is because of that that your decision, whether it is life without the possibility of parole or the death penalty, is an expression — is an expression of society's attitudes towards crimes.  Because, if you think about it for a minute, the only way society can say anything about a crime, how they feel about it — good, bad, or otherwise — is how?  By punishment."

Defendant now contends the prosecutor's argument lessened the jurors' sense of responsibility regarding their role in imposing a death sentence in violation of his rights under the Eighth and Fourteenth Amendments to the federal constitution.  (*Caldwell v. Mississippi* (1985) 472 U.S. 320 (*Caldwell*).)  The contention is cognizable despite defendant's failure to object to the comments at the time because his trial predated the finality of our decision in *People v. Cleveland* (2004) 32 Cal.4th 704, 762.  (See *People v. Moon* (2005) 37 Cal.4th 1, 17-18; accord, *People v. Loy* (2011) 52 Cal.4th 46, 59.)  The contention is, however, meritless.

91

In *Caldwell*, a capital case, the prosecutor responded to a defense argument emphasizing the gravity of the jury's role in deciding the penalty by telling the jurors that the jury's " 'decision is not the final decision,' " (*Caldwell, supra,* 472 U.S. at p. 325) and that " 'the decision you render is automatically reviewable by the Supreme Court.' " (*Id.* at pp. 325-326.)  In reversing, a plurality of the Supreme Court held "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Id*. at pp. 328-329.)

"In deciding whether *Caldwell* error occurred, we do not consider the challenged statements in isolation but in the context in which they occurred." (*People v. Loy, supra,* 52 Cal.4th at p. 59; accord, *People v. Hinton, supra,* 37 Cal.4th at p. 905.)  Moreover, "[t]he high court has since clarified that *Caldwell* error occurs only when the remarks to the jury concerning its role in the sentencing process are inaccurate or misleading in a way that allows the jury to feel less responsible than it should for the sentencing decision." (*People v. Elliott, supra,* 53 Cal.4th at pp. 556-557, citing cases.)

The prosecutor's argument regarding Locke's theory of the social contract, and his assertion that capital sentencing is exceptional in that the jury — not a set sentencing law — decides on the punishment, did not mislead the jury or diminish its sense of responsibility.  On the contrary, read as a whole, the prosecutor's argument emphasized the heavy and exceptional responsibility that society places on a capital jury to determine the appropriate penalty.  The prosecutor's argument did not suggest, as defendant argues, that in determining a capital penalty the ancient expectation that a criminal must be punished in kind — eye for eye, death for death — survives.  The prosecutor only argued that under the social contract theory, there is still an expectation that punishment should be commensurate with

92

the crime. The prosecutor further explained that because society and the California Legislature consider first degree murder with special circumstances to be the most serious crime, the potential punishment includes the possibility of the death penalty. The prosecutor argued death was the appropriate penalty for defendant, but acknowledged it was not the only possible punishment. It was not improper for the prosecutor to argue that the jury would be acting as the representative of the community or for society as a whole. (*Caldwell, supra,* 472 U.S. at p. 333 [capital jury may be asked to decide penalty "on behalf of the community"]; *People v. Ledesma* (2006) 39 Cal.4th 641, 741; see *People v. Zambrano, supra,* 41 Cal.4th at pp. 1177-1178; *People v. Clark* (1992) 3 Cal.4th 41, 167.)

### D. Challenges to California's Death Penalty Statute

Defendant contends many features of California's death penalty scheme and related jury instructions violate the United States Constitution. Acknowledging that we have previously rejected these claims, defendant presents them for purposes of urging our reconsideration and preserving them for federal review. We are not persuaded to reconsider the conclusions we have previously reached and reject them again as follows:

Section 190.2 is not impermissibly overbroad in violation of the United States Constitution. "Specifically, the various special circumstances are not so numerous as to fail to perform the constitutionally required narrowing function, and the special circumstances are not unduly expansive, either on their face or as interpreted by this court." (*People v. Jennings* (2010) 50 Cal.4th 616, 688; accord, *People v. Streeter* (2012) 54 Cal.4th 205, 267-268.)

Allowing the jury to consider the circumstances of the crime (§ 190.3, factor (a)) does not permit arbitrary and capricious imposition of a sentence of

death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. (*People v. Jennings, supra,* 50 Cal.4th at pp. 688-689; *People v. Jenkins* (2000) 22 Cal.4th 900, 1050-1051.)

Section 190.3 and the pattern jury instructions based thereon are not constitutionally defective for failing to require the state to bear the burden of proof beyond a reasonable doubt or even the burden of persuasion that an aggravating factor exists, that the aggravating factors outweigh the mitigating factors, and that death is the appropriate penalty. (*People v. Bramit, supra,* 46 Cal.4th 1221, 1249-1250; *People v. Lenart* (2004) 32 Cal.4th 1107, 1136-1137.) The death penalty law is not unconstitutional for "failing to inform the jury that no party bore the burden of proof." (*People v. Mills* (2010) 48 Cal.4th 158, 213.) "Defendant was not entitled to an instruction regarding a presumption of life." (*People v. Streeter, supra,* 54 Cal.4th at p. 268.) The federal Constitution is not violated by the failure to require a penalty phase jury to reach unanimity on the presence of aggravating factors (*People v. Martinez* (2009) 47 Cal.4th 399, 455), or on whether prior violent criminal activity has been proved. (*People v. Clark, supra,* 52 Cal.4th at p. 1007.) We continue to reject the contention that these conclusions are called into question by the high court's decisions regarding the Sixth Amendment's jury trial guarantee in *Apprendi, supra,* 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*), and *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*). (*People v. Fuiava, supra*, 53 Cal.4th at p. 732; *People v. Lomax, supra,* 49 Cal.4th at p. 593; *People v. Whisenhunt, supra,* 44 Cal.4th at p. 227.)

There is no need to instruct the jury that mitigating factors can be considered only in mitigation or that if the mitigating evidence outweighs the aggravating evidence, the jury must impose a sentence of life without the possibility of parole. (*People v. Fuiava, supra,* 53 Cal.4th at pp. 732-733.) The

94

trial court is not required to omit from the jury instructions those sentencing factors that appear not to apply to defendant's case. (*Id.* at p. 733.) And, use of the adjectives "extreme" and "substantial" in section 190.3, factors (d) and (g), does not unconstitutionally impose a barrier to the consideration of mitigating evidence. (*People v. Clark, supra,* 52 Cal.4th at p. 1007.)

The absence of written or other specific findings by the jury regarding aggravating factors did not deprive defendant of his federal due process and Eighth Amendment rights to meaningful appellate review, violate equal protection of the laws or violate defendant's Sixth Amendment right to trial by jury. (*People v. Parson* (2008) 44 Cal.4th 332, 370; *People v. Romero* (2008) 44 Cal.4th 386, 428-429.)

"The instruction that jurors may impose a death sentence only if the aggravating factors are ' "so substantial" ' in comparison to the mitigating circumstances that death is warranted does not create an unconstitutionally vague standard." (*People v. Carrington* (2009) 47 Cal.4th 145, 199.) CALJIC No. 8.88 does not violate the Eighth and Fourteenth Amendments by asking the jury to consider whether the circumstances "warrant[]" death, rather than if death is the "appropriate" penalty. (*People v. Duenas* (2012) 55 Cal.4th 1, 27.)

"Review for intercase proportionality" is not required by the federal Constitution. (*People v. Harris, supra,* 43 Cal.4th at pp. 1322-1323; accord, *People v. Romero, supra,* 44 Cal.4th at p. 429.)

"California's capital sentencing procedures do not violate principles of equal protection of the law on the ground they provide safeguards different from those found in noncapital cases." (*People v. Williams, supra,* 43 Cal.4th at p. 650.)

Finally, "California does not employ the death penalty as a ' "regular punishment for substantial numbers of crimes" ' [citation], and its imposition does

95

not violate international norms of decency or the Eighth Amendment's prohibition against cruel and unusual punishment. [Citation.]" (*People v. Clark, supra,* 52 Cal.4th at p. 1008, italics omitted.)

### E. Asserted Determinate Sentencing Errors

Defendant was sentenced to death for his conviction of first degree murder with special circumstances. With respect to his convictions of the four nonhomicide offenses, the trial court imposed, but stayed, a determinate sentence totaling 19 years, calculated as follows: the upper term of 11 years for the conviction of kidnapping for purposes of child molestation; a consecutive upper term of eight years for the conviction of rape; a concurrent upper term of eight years for the conviction of sodomy; and a concurrent upper term of eight years for the conviction of a lewd and lascivious act with a child.

The trial court stated it imposed the upper term of 11 years for defendant's kidnapping conviction because it found that the aggravating circumstances outweighed the mitigating circumstances. (Cal. Rules of Court, former rule 420(a) & (b).)[19] Specifically, although defendant had no prior criminal record, had mental problems "to a certain extent," and had made an early acknowledgement of guilt (former rule 423(b)(1), (2), (3); see now rule 4.423(b)(1), (2), (3)), the court found such mitigating factors were outweighed by the aggravating circumstances of the vulnerability of the victim, the fact defendant planned and premeditated the crime, and the circumstance that defendant took advantage of a position of trust in order to perpetrate the crime. (Former rule 421(a)(3), (8), (12); see now rule 4.421(a)(3), (8), (11).) With respect to defendant's conviction of rape, the trial court stated it was imposing an additional separate and consecutive term of eight

---

[19]    All further rule references are to the California Rules of Court.

years under the provisions of section 667.6, subdivision (c), which permitted such a sentence when the circumstances justify it. The trial court found the consecutive sentence justified because the rape and the kidnapping occurred at different times and places, and defendant had numerous opportunities to think about what he was doing after he picked up Nadia. The trial court did not provide a separate explanation for why it chose the upper term of eight years for defendant's rape conviction. The trial court did not state reasons for its imposition of concurrent upper eight-year terms for defendant's sodomy and lewd act convictions.

Defendant argues that under the statutes and rules in existence at the time of his sentencing hearing in 1993, he is entitled to a remand for resentencing because the trial court (1) improperly used two aggravating factors that constituted elements of kidnapping in violation of section 207, subdivision (b), as reasons for its imposition of the 11-year upper term for that crime, (2) failed to state the reason for its imposition of the upper terms on his rape, sodomy, and lewd act convictions, and (3) made findings of aggravating facts for the purpose of imposing the upper terms or consecutive sentences in violation of defendant's federal constitutional rights under *Apprendi, supra,* 530 U.S. 466, *Blakely, supra,* 542 U.S. 296, and *Cunningham, supra,* 549 U.S. 270.[20]

---

[20] In his reply brief, defendant concedes that subsequent to the filing of his opening brief the high court held that the *Apprendi* line of cases does not apply to a sentencing judge's decision to impose consecutive sentences. (*Oregon v. Ice* (2009) 555 U.S. 160, 164, 168.) Defendant's remaining claims are cognizable despite his failure to object at the time of sentencing because they involve a sentencing hearing predating our holding in *People v. Scott* (1994) 9 Cal.4th 331, 357-358, and the high court's decision in *Blakely, supra,* 542 U.S. 296. (*People v. Black* (2007) 41 Cal.4th 799, 810-812; *People v. Stitely* (2005) 35 Cal.4th 514, 575.)

The Attorney General does not address defendant's first two claims because she concedes the third error as to the trial court's imposition of upper terms. She argues it was harmless beyond a reasonable doubt.

As we have recently summarized: "*Apprendi*[*, supra,*] 530 U.S. 466 holds that, under the Sixth Amendment, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' (*Apprendi, supra,* at p. 490.) In *Blakely*[*, supra,*] 542 U.S. 296, the high court extended the scope of *Apprendi* by defining 'statutory maximum' as the 'maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.' [Citations.] Applying *Blakely*, the court later held in *Cunningham*[*, supra,*] 549 U.S. 270, that California's determinate sentencing law did not comport with a defendant's Sixth Amendment jury trial right. As *Cunningham* explained, 'If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.' [Citation.] Because the aggravating circumstances necessary for imposition of an upper term 'depend on facts found discretely and solely by the judge [citation], the 'statutory maximum' prescribed in California's sentencing scheme is not the upper term but rather the middle term [citation.]." (*People v. Myles* (2012) 53 Cal.4th 1181, 1220.) In *People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*), we concluded that the erroneous imposition of an upper term under this line of cases is subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18. (*Sandoval, supra,* at p. 838.)

We agree with the parties that the trial court violated defendant's Sixth Amendment rights when it selected the upper term for defendant's conviction of kidnapping for purposes of child molestation, relying on Nadia's vulnerability, the fact defendant planned and premeditated the crime, and the circumstance that

98

defendant took advantage of a position of trust in order to perpetrate the crime —
facts that were not established by the jury's verdict or admitted by defendant.
(*Cunningham*, *supra*, 549 U.S. at p. 293; *People v. Black, supra,* 41 Cal.4th at
p. 816; *Sandoval, supra,* 41 Cal.4th at pp. 837-838, 839.)

In considering prejudice, "the pertinent inquiry is 'whether, if the question
of the existence of an aggravating circumstance or circumstances had been
submitted to the jury, the jury's verdict would have authorized the upper term
sentence.' (*Sandoval, supra,* 41 Cal.4th at p. 838.) '[I]f a reviewing court
concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-
reasonable-doubt standard, unquestionably would have found true at least a single
aggravating circumstance had it been submitted to the jury, the Sixth Amendment
error properly may be found harmless.' (*Id*. at p. 839.)" (*People v. Myles, supra,*
53 Cal.4th at p. 1221.)

We agree with the Attorney General that the error in this case was
harmless. We are persuaded beyond a reasonable doubt that the jury would have
found true at least one of the aggravating circumstances stated by the court had
they been charged and submitted to the jury for its consideration.

The evidence presented to the jury reflected that defendant rented a motel
room for two persons. He then drove to the area near Diamond Elementary
School where he contacted third-grader Sandra C. He unsuccessfully tried to get
Sandra into his car by telling her he was a teacher and needed help with some
books. In his recorded interview with investigating officers, defendant later said
that he used the same ruse to successfully lure nine-year-old Nadia into his car.[21]

---

[21] In his testimony at the sanity phase, defendant claimed he made up this
story when he was talking to the police because they were scaring him and he
thought that was what the police wanted to hear. Given this later denial, we do not

*(Footnote continued on next page.)*

99

He returned with her to the motel room he had previously rented. Because these circumstances clearly were relevant to defendant's intent in committing the crimes against Nadia, defendant had both reason and opportunity to challenge them at trial. (Cf. *People v. Sandoval, supra,* 41 Cal.4th at p. 839.) The jury's verdicts of guilt reflect its rejection of defendant's weak attempts to do so. These facts showed the kidnapping and sexual crimes were not a spontaneous decision based on a coincidental encounter between defendant and Nadia. Rather, defendant deliberately acquired a private room, drove to an area where young children could be found, at a time when they likely would be walking home, and separately contacted two young girls walking alone with a story about being a teacher needing help with some books, which defendant had in his car. Further, defendant persisted in contacting Nadia and repeating his ruse after his first attempt to lure Sandra C. failed. Unquestionably, under these circumstances, a jury would find planning and sophistication by defendant in committing the crimes. (Former rule 421(a)(8).) We conclude the violation of defendant's Sixth Amendment rights under *Apprendi* was harmless.

We reject defendant's additional claim that because of the age range and ruse elements of the crime of kidnapping for purposes of child molestation as defined by section 207, subdivision (b), the trial court erred in using Nadia's particular vulnerability and defendant's abuse of a position of trust (former rule 421(a)(3), (12)) as reasons for imposing the upper term sentence for defendant's kidnapping conviction. Case law has explained that for purposes of finding the

---

*(Footnote continued from previous page.)*

consider defendant to have admitted this fact for purposes of permitting the trial court to find related sentencing factors. (*Blakely, supra*, 542 U.S. at p. 303.)

aggravating factor of particular vulnerability, " '[p]articularly . . . means in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act.' [Citation.]" (*People v. Loudermilk* (1987) 195 Cal.App.3d 996, 1007.) Thus, a crime victim can be deemed particularly vulnerable as an aggravating factor "for reasons not based solely on age, including the victim's relationship with the defendant and his abuse of a position of trust." (*People v. Stitely, supra,* 35 Cal.4th at p. 575; accord, *People v. Dancer* (1996) 45 Cal.App.4th 1677, 1694-1695, disapproved on another ground in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123.)

Here defendant approached Nadia while she was walking alone from school to her home, represented himself to be a teacher, and asked for Nadia's help. Defendant thereby took advantage of Nadia's location and isolation. His story told so near the school and after the school day made it all the more believable. He preyed on her naiveté and natural deference to a teacher's position of authority. There was also evidence that Nadia was especially likely to respond to defendant's request for help. The assistant principal at Nadia's school testified to Nadia's helpful personality. Given these facts, the trial court's finding that Nadia was "particularly vulnerable" does not *solely* rest on Nadia's age. (*People v. Dancer, supra,* 45 Cal.App.4th at pp. 1693-1694.)

Although it is true, as defendant points out, that section 207, subdivision (b), proscribes kidnapping of a child for purposes of child molestation by means of "false promises, misrepresentations, or the like," the specific nature of the ruse used by defendant also went beyond the elements of the offense. Defendant claimed to be a person with very "special status" to children of Nadia's age — a teacher, making it more likely she would accede to his request for help. (See, e.g.,

*People v. King* (2010) 183 Cal.App.4th 1281, 1322-1323 [defendant exploited position of trust by acting as police officer].)

Finally, under the circumstances of this case, we do not find it necessary to remand for resentencing on defendant's rape, sodomy, and lewd act convictions because of the trial court's failure to state reasons for its imposition of the upper term as to those convictions. Such error is harmless because it is not reasonably probable that resentencing would result in a sentence more favorable to defendant. (*People v. Davis* (1995) 10 Cal.4th 463, 552; *People v. Zamarron* (1994) 30 Cal.App.4th 865, 870.)

### F. Cumulative Error

Defendant contends that the cumulative effect of the errors he has raised undermined the fundamental fairness of the trial and reliability of the death judgment. He contends reversal is required. " 'Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment.' [Citation]." (*People v. Panah* (2005) 35 Cal.4th 395, 479-480.)

## III. Conclusion

The judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. DeHoyos

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S034800
**Date Filed:** July 8, 2013

_____

**Court:** Superior
**County:** Orange
**Judge:** Everett W. Dickey

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Gary D. Garcia, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gary D. Garcia
Deputy State Public Defender
221 Main Street, Tenth Floor
San Francisco, CA  94105
(415) 904-5600

Annie Featherman Fraser
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2427